Roger Dwain EPPS, Samuel Lilburn Stone, III, Plaintiffs-Appellants,

v.

ST. MARY'S HOSPITAL OF ATHENS, INC., et al., Defendants-Appellees.

No. 85–8952.

United States Court of Appeals, Eleventh Circuit.

Oct. 17, 1986.

Rehearing and Rehearing En Banc Denied Nov. 26, 1986.

Albert M. Pearson, University of Georgia School of Law, Athens, Ga., for plaintiffs-appellants.

Gary B. Blasingame, Athens, Ga., for St. Mary's.

J.M. Hudgins, IV, Alan L. Newman, Arnold Wright, Jr., Atlanta, Ga., for Maddox, Smith, Decker, Huff, Tiller.

Before KRAVITCH and HATCHETT, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This is an appeal from the grant of summary judgment on appellants' claim for actual and punitive damages under the federal wiretapping statute, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510–2520. Appellants brought suit when their telephone conversation was recorded by an employee of St. Mary's Hospital and subsequently listened to by other employees. We affirm the grant of summary judgment.

## BACKGROUND

This action arises from an incident that occurred in the Emergency Medical Services (EMS) office at St. Mary's Hospital in Athens, Georgia on July 20, 1980. At the time, both appellants were employed by St. Mary's Hospital as emergency medical technicians. Appellant Epps and his partner, Kyser Cartledge, were stationed at the westside substation, which is a trailer equipped with furniture, a television set, two telephones, and a map.

Appellant Stone and his partner, Stephanie Smith, were stationed in the Emergency Services principal office, located across the hall from the hospital's emergency room. The EMS office is made up of three rooms: an inner room containing bunkbeds, a television, and a telephone; an outer room containing an assortment of furniture and a telephone; and a small storage room.

Downstairs from the EMS office is the EMS dispatch center, which houses the dispatch console into which emergency calls are made and from which EMS dispatchers notify the emergency medical technicians. Calls coming into or going out from the dispatch console are automatically recorded on a large, double-reeled tape recorder. Outgoing calls not originating in dispatch are not recorded automatically, but can be recorded manually by depressing the record button on the dispatch console.

Between 10:00 o'clock and 11:00 o'clock p.m., on July 20, 1980, appellant Stone used the westside "ringdown line" to call appellant Epps. The "ringdown line" connects the dispatch office to the westside substation. It is one of the extensions on a telephone provided to EMS by Southern Bell. When the button for this extension is depressed, the phone at the westside station rings automatically. The call, however, must first pass through Southern Bell's central office, by way of Southern Bell Cable.

During Stone's conversation with Epps, appellee Stephanie Smith was watching television in the adjacent room, about three feet away. She overheard Stone make disparaging remarks about appellees George Tiller, a supervisor of medical technicians, and James Maddox, a dispatch supervisor. As to Tiller, Stone stated: "Mr. Tiller had no right to tell him (Stone) what to do because he (Tiller) had no certification, and that he (Tiller) was basically the hospital's nigger." As to Maddox, Stone stated:

"Mr. Maddox always had to have his nose up everybody's else's butt trying to figure out what was going on."

After listening for approximately 15 minutes, appellee Smith went downstairs to the dispatch center to relieve the dispatcher on duty. She began recording the Stone-Epps conversation two or three minutes later.

The other appellees are alleged to have listened to and disclosed or used the contents of the recording.

## DISCUSSION

A civil remedy is provided under 18 U.S.C. § 2520 in favor of any person whose wire or oral communication is intercepted, disclosed, or used in violation of 18 U.S.C. § 2511(1).[1] To prevail under § 2520, appellants must first show that their telephone conversation was a wire communication within the meaning of 18 U.S.C. § 2510(1) or an oral communication within the meaning of 18 U.S.C. § 2510(2).

As defined by § 2510(1),

"Wire communication" means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connec-

tion between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications.

Appellants read this definition as encompassing any communication made through the use of equipment or facilities furnished or operated by a common carrier. Appellees, on the other hand, read the definition as limited to communication which takes place over a facility or equipment that is capable of being used in interstate or foreign communications, or which is furnished for the purpose of being used in interstate or foreign communications.

■ We agree with the appellees' wording but we disagree with their interpretation. They contend that the Stone-Epps conversation is not a wire communication because the "ringdown line" is not a "facility" provided or operated for the transmission of interstate or foreign communications. When considering the statute's use of the term "facility," appellees concentrate solely on the "ringdown line" extension. This approach, however, is too narrow. Indeed, the "ringdown line" is mere-

1. Section 2511(1) states:
 (1) Except as otherwise specifically provided in this chapter any person who—
 (a) willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication;
 (b) willfully uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when—
 (i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or
 (ii) such device transmits communications by radio, or interferes with the transmission of such communication; or
 (iii) such person knows, or has reason to know, that such device or any component thereof has been sent through the mail or transported in interstate or foreign commerce; or
 (iv) such use or endeavor to use (A) takes place on the premises of any business or other commercial establishment the opera-

tions of which affect interstate or foreign commerce; or (B) obtains or is for the purpose of obtaining information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or
 (v) such person acts in the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States;
 (c) willfully discloses, or endeavors to disclose, to any other person the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection; or
 (d) willfully uses, or endeavors to use, the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection;
shall be fined not more than $10,000 or imprisoned not more than five years, or both.

ly one extension on a telephone provided to EMS by Southern Bell; it is not a separate entity. Thus, we believe that the entire telephone, not just the particular extension in question, is the "facility" referred to in the statute.

Since there is no allegation that the EMS telephone is not capable of interstate or foreign communication,[2] we find that the Stone-Epps conversation constitutes a wire communication.

Having determined that the Stone-Epps conversation is a wire communication, we must now determine whether it was intercepted within the meaning of 18 U.S.C. § 2510(4), where "intercept" is defined as the "... aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device." There is no interception, and thus no liability under Title III, if the aural acquisition is through the use of an instrument which falls outside the definition of "electronic, mechanical, or other device." These terms are defined in § 2510(5). It states:

"Electronic, mechanical or other device" means any device or apparatus which can be used to intercept a wire or oral communication other than (a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) being furnished to the subscriber or user by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business.

This is known as the "extension phone exception," *Briggs v. American Air Filter Co., Inc.*, 630 F.2d 414, 425 (5th Cir.1980), or the "business extension exemption." *Watkins v. L.M. Berry & Co.*, 704 F.2d 577, 580 (11th Cir.1983).

Appellants argue that this exception, however labeled, is irrelevant because the double reel recording equipment, which they view as the intercepting device, was not furnished by a common carrier. According to appellants, the act of interception was depressing the "ringdown line" button on the dispatch console. We agree with this proposition.

■ We disagree, however, with appellant's contention that the electronic or mechanical device used for interception was the recording equipment. We believe the intercepting device was the dispatch console. The console intercepted[3] the call. The double reel recorder recorded it. *Cf. United States v. Harpel*, 493 F.2d 346, 350 (10th Cir.1974) (when recording made by attaching suction cup to telephone receiver and connecting it to tape recorder, telephone receiver is intercepting mechanism, not recorder.)

■ Next, appellants argue that in order for this exception to apply, appellee Smith had to have used a standard telephone extension to listen to the conversation. We reject this argument.

Although this exception is known as the "telephone extension exception," or the "business extension exemption," the language of the statute clearly applies to " ... any telephone or telegraph instrument, equipment or facility, or any component thereof...." It can hardly be ques-

---

**2.** We reject appellee's contention that the communication in question was made over an intercom type telephone line as in *People v. Santos*, 102 Cal.Rptr. 678, 26 Cal.App.3d 397 (1972). There, the telephone in question was not a part of the public telephone system, but was maintained by the prison as a private intercom system.

We also reject the contention that *United States v. Christman*, 375 F.Supp. 1354 (N.D.Cal. 1974), involved a facility similar to the one used here. In that case, the facility was a closed dial telephone system intended to be used only for calls within the store, or to other stores of the

same chain. Calls into the general telephone system were possible only through the assistance of the switchboard operator. The district court held that it was a private telephone system.

EMS had nothing approaching a private telephone system.

**3.** Here, our use of the term intercepted is in accordance with its common definition, not as it is defined under Title III, since we conclude *infra* that there was no interception within the meaning of the statute.

tioned that the dispatch console comes under the heading telephone equipment or facility.[4] *Cf. James v. Newspaper Agency Corp.*, 591 F.2d 579, 581 (10th Cir.1979), (monitoring system installed by Southern Bell as part of general telephone service falls under telephone extension exception.)

Finally, appellants argue that this exception does not apply because the interception and recording of their conversation was not in the ordinary course of St. Mary's business, as the hospital's policy was to automatically record only calls coming into or going out from the dispatch console. According to appellants, there was no policy of monitoring any other calls, nor were hospital personnel authorized to record any other calls. Further, appellants argue that appellee Smith operated the console even though she was not an authorized dispatcher as required by EMS policy.

In response, appellees argue that the recording of the call was in the ordinary course of business because the content of the conversation dealt with employee relations, which is of direct concern to St. Mary's. In support of this argument, appellees cite *Watkins v. L.M. Berry & Co.*, 704 F.2d 577 (11th Cir.1983); *Briggs v. American Air Filter*, 630 F.2d 414 (5th Cir.1980); and *United States v. Christman*, 375 F.Supp. 1354, 1356 (N.D.Cal. 1974).

We believe *Watkins v. Berry* controls our disposition of this issue. The plaintiff in that case was employed by the Berry Company as a sales representative. She solicited companies to advertise in South Central Bell's Yellow Pages. As a part of its regular training program, Berry Company monitored solicitation calls and reviewed them with employees to improve their sales techniques. Personal calls were not monitored except to the extent necessary to determine whether a particular call was of a personal or business nature. The monitoring was accomplished with a standard extension telephone.

During plaintiff Watkins' lunch hour, she received a call from a personal friend. The two discussed a job interview that plaintiff had with another company. Unbeknownst to plaintiff, this conversation was being monitored. To vindicate her privacy rights, she brought suit under the federal wiretapping statute.

The Eleventh Circuit read *Briggs v. American Air Filter, supra*, as articulating the general rule that: " ... if the intercepted call was a business call, then Berry Co.'s monitoring of it was in the ordinary course of business. If it was a personal call, the monitoring was probably, but not certainly, not in the ordinary course of business." *Watkins v. Berry, supra*, at 582.

Applying this standard to the case before it, the Court rejected the contention that the monitoring was in the ordinary course of business because the contents of the conversation might be of interest to plaintiff's employer. The Court then noted that:

> Berry Co. might have been curious about Watkins' plans, but it had no legal interest in them. Watkins was at liberty to resign at will and so at liberty to interview with other companies. Her interview was thus a personal matter, neither in pursuit nor to the legal detriment of Berry Co.'s business....

As a personal call, the Court held that it could be intercepted only to the extent necessary to determine if it was of a business or personal nature. *Id.* at 583–84.

 Operating within the framework of *Watkins v. Berry*, we hold that this was

---

**4.** In discussing this exception, the former Fifth Circuit observed that an earlier draft of § 2510(5)(a) defined the term "electrical, mechanical, or other device" as not including "an extension telephone instrument furnished to the subscriber or user by a communications common carrier in the ordinary course of its business." *Briggs v. American Filter Co., Inc.*, 630 F.2d 414, 418 (citing H.R. 5470, 90th Cong., 1st Sess., § 2512(d)(1) (1967), reprinted in Hearings on the Anti-Crime Program before the Subcomm. No. 5 of House Comm. on the Judiciary, 90th Cong., 1st Sess. 892, 894 (1967).) As we have noted, the language of the statute is not limited to standard telephone extensions, and we refuse to so limit it, especially in the face of evidence that Congress considered and rejected such a limitation.

not a personal call. It occurred during office hours, between co-employees, over a specialized extension which connected the principal office to a substation, and concerned scurrilous remarks about supervisory employees in their capacities as supervisors. Certainly the potential contamination of a working environment is a matter in which the employer has a legal interest.[5] Accordingly, we hold that this case falls within the "telephone extension exception." [6] Thus, there is no liability under Title III.

The judgment is AFFIRMED.

KRAVITCH, Circuit Judge, concurring in part and dissenting in part:

I part company with the majority solely on the issue of whether appellees satisfied the "during the ordinary course of business" element of the telephone extension exception embodied in 18 U.S.C. § 2510(5). Because I do not agree that *Watkins v. L.M. Berry & Co.*, 704 F.2d 577 (11th Cir. 1983) controls this issue, I respectfully dissent.

*Watkins* and *Briggs v. American Air Filter*, 630 F.2d 414 (5th Cir.1980) provide useful guidelines for corporate personnel who wish to monitor employee phone calls within the boundaries established by the federal wiretapping statute: in the ordinary course of business, business calls may be monitored and personal calls may not. I disagree with the majority's analysis, however, in that it relies on appellants' conduct and conversation to determine that Smith's actions were in the ordinary course of business.

Congress enacted the wiretapping statute to punish and deter eavesdropping; it did not parse conversations into protected and unprotected categories. The content of a monitored conversation, while significant, is not dispositive. Although common sense dictates that only a business call would be monitored during the course of business, determining that a business call has been monitored does not end our inquiry. We should also scrutinize Congress' real target: the eavesdropper.

Case law suggests that Smith's eavesdropping was not the sort of activity Congress intended to immunize. In *Briggs* a supervisor legitimately monitored the conversation of an employee he suspected of divulging business secrets to competitors. In *Watkins* we indicated that an employer may, pursuant to an announced policy, randomly monitor the telephonic business solicitations of its employees. Crucial to both analyses is that, in order to be beyond the statute's reach, the eavesdropper must have a legitimate business purpose and authorization [1] to intrude on employee privacy. *See also James v. Newspaper Agency Corp.*, 591 F.2d 579, 581–82 (10th Cir.1979). The present case is inapposite. Here, Smith was not authorized to operate the dispatch console from which she monitored the Stone and Epps conversation and nothing in the record suggests that her eavesdropping was pursuant to her duties at St. Mary's Hospital.

More important, Smith did not monitor the conversation for a legitimate business purpose. A call must be more than merely related to business; the monitoring must advance a legitimate business purpose. *See Watkins*, 704 F.2d at 582 ("The phrase

---

5. Appellants read *Watkins v. Berry* as articulating the rule that a personal call is one in which an employer has no legal interest.

6. We reject appellants' argument that we need not look at the contents or nature of the conversation because the interception was not done pursuant to any known legitimate business policy. In *Watkins v. Berry*, the extent of the monitoring was beyond that allowed by the articulated policy.

1. Authorization may be explicit, see *Watkins*, or implied, see *Briggs*. Express authorization, however, is neither a prerequisite to legitimate monitoring or a talisman that automatically legitimates monitoring. A whistleblower might properly monitor the call of a co-worker divulging trade secrets without prior authorization: the authorization in that case would be implicit. On the other hand, no amount of authorization short of employee consent would justify the monitoring of personal calls. Express authorization is merely one factor in our analysis.

'in the ordinary course of business' cannot be expanded to mean anything that interests a company.''). Smith took it upon herself to relieve another employee at the dispatch console to record the conversation for her employer because she knew Stone was talking to Epps about an upcoming meeting with the hospital's personnel department and "sounded upset." She testified that she had not listened to the conversation as she recorded it. An eavesdropper, however, cannot evade the federal statute by asserting that her employer might be interested to know that two of its employees were conversing about their employment and one sounded upset. Moreover, Smith's post hoc rationalization that her activity was in the ordinary course of business because St. Mary's might be interested in knowing that its payroll included two disgruntled bigots with crude vocabularies is irrelevant. Even if this rationalization were a legitimate business concern, the conversation was not recorded for that purpose. The legitimate business purpose must exist at the time the conversation is recorded. At the time the call was recorded, Smith was unaware of the conversation's contents and had not bothered to determine whether she was improperly recording a personal phone call. My reading of the record suggests that Smith was engaged in a fishing expedition to gather material that could be used to oust Stone and Epps from their employment at St. Mary's.[2] As such, the conversation was not recorded in the ordinary course of business.

In sum, the wiretapping statute exempts those who monitor a narrow class of conversations for legitimate reasons; it does not immunize busybodies and malicious gossips. I agree with the majority that Epps' and Stone's conversation was scurrilous and reprehensible. I believe, however, that Smith's conduct was also reprehensible and, unlike Stone and Epps, her con-

duct was proscribed by the federal wiretapping statute. I would reverse and remand for a determination of damages, if any.

---

**2.** When asked why she had recorded the call, Smith testified:

> You can call it an inquisition and I have a concern with our department in a sense. In our field you cannot have any anguishes ...

out in the open if you have to work together all the time ... it was something that I could justify and bring to whoever attention I needed to bring it to.