736

Beverly SANDERS, Plaintiff–Appellee,

v.

ROBERT BOSCH CORPORATION, a Delaware Corporation registered to do business in South Carolina, Defendant–Appellant.

Beverly SANDERS, Plaintiff–Appellant,

v.

ROBERT BOSCH CORPORATION, a Delaware Corporation registered to do business in South Carolina, Defendant–Appellee.

Nos. 93–2351, 93–2423.

United States Court of Appeals,
Fourth Circuit.

Argued July 11, 1994.

Decided Oct. 28, 1994.

Petition for Rehearing and Suggestion for Rehearing In Banc Jan. 24, 1995.

**ARGUED:** Henry S. Knight, Jr., Nelson, Mullins, Riley & Scarborough, Columbia, SC, Richard Bruce Watson, Nelson, Mullins, Riley & Scarborough, Charleston, SC, for appellant. Margaret D. Fabri, Charleston, SC, Terry Ann Rickson, Charleston, SC, for appellee. **ON BRIEF:** Craig M. Cornish, Cornish & Dell'Olio, Colorado Springs, CO, for appellee.

Before RUSSELL, WIDENER, and HALL, Circuit Judges.

Affirmed by published opinion. Judge RUSSELL wrote the opinion, in which Judge HALL joined. Judge WIDENER wrote a concurring and dissenting opinion.

## OPINION

DONALD RUSSELL, Circuit Judge:

Plaintiff Beverly Sanders was a security officer employed by Guardsmark, Inc. ("Guardsmark"). Guardsmark contracted to provide security services to defendant Robert Bosch Corporation ("Bosch") and, from 1985 to 1990, Sanders worked at Bosch's plant in Charleston, South Carolina. While working at the plant, plaintiff manned the telephones in Bosch's security office. Bosch had installed a tape recording device known as a "voice logger," which recorded, 24 hours a day, 7 days a week, all telephone conversations undertaken on some of the telephone lines with extensions in the security office. Plaintiff initiated this suit against Bosch, alleging that Bosch violated her rights under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, known as the Federal Wiretapping Act (the "Act"), codified at 18 U.S.C. §§ 2510–2521, by virtue of the constant recording, unbeknownst to her, of her telephone conversations. She also claimed that Bosch continued to violate the Act when, even after the voice logger was no longer recording telephone conversations, the

device nevertheless, evidently unbeknownst to anyone, continued to transmit ambient noise from the guards' office.

The district court found that Bosch's constant recording of plaintiff's telephone conversations did not fall within the relevant business-use exception and therefore constituted a violation of the Act. Defendant appeals from this determination. The district court also found that the Act was not violated when, although Bosch believed it had shut the voice logger off, the device continued to transmit ambient noise from the guards' office. Plaintiff appeals from this determination, and also appeals the district court's jury instruction as to punitive damages. We affirm the judgment below in all respects.

## I.

Bosch explains its decision to install the voice logger as a response to bomb threats which the company claims to have previously received. In 1988, Bosch constructed a new administration building which included all-new telecommunications equipment. This equipment included two "attendant consoles" provided by BellSouth. The attendant console must be manned by an operator who transfers incoming calls to the appropriate extensions. The console includes a handset which is donned by the individual manning the console when an incoming call is received. BellSouth installed one of the consoles in the security office and the other in the reception office.

As a security precaution, Bosch purchased and installed an eight-channel voice logger to record telephone activity on the main public access telephone lines into the plant. The voice logger was connected to telephone extensions which BellSouth installed in Bosch's security control room (known as the "penthouse"). The voice logger commenced operation in January of 1989.

The voice logger was an eight-channel reel-to-reel tape recorder. Seven of the eight channels were available to connect to telephone lines. The eighth channel continuously indexed the time and date, so as to allow easy access of particular conversations. All eight channels were recorded simultaneously on 24-hour tape reels which were changed daily. One reel was designated for each day of the week; every week each reel was reused, meaning that the recordings from the previous week were erased weekly.[1]

Of the hundreds of telephone numbers assigned to Bosch's plant, any of which can be reached by direct-dial from outside of the plant, Bosch's officers identified what they believed to be the seven numbers most likely to receive incoming security threats: two channels were assigned to the main plant number, one at each of two extensions; two channels were assigned to each of two numbers assigned to the two security gates at the plant; and three channels were assigned to three telephone lines in the security office which were connected through the attendant console in that office.[2]

As noted above, Guardsmark contracted with Bosch to provide security services. Bosch officials advised Guardsmark supervisory personnel of the existence of the voice logger, but did not so advise the other security officers assigned to Bosch's plant until after the voice logger had been shut down and removed. All of the monitored lines were manned by Guardsmark security personnel.

Phillip Schaffner, a Bosch official in charge of security, and St. Clair, another Bosch security official who reported to Schaffner, both testified that, during the period that the voice logger was activated, no threatening phone calls were received, and that, consequently, they never listened to any full recordings of calls made by the voice logger. At most, they listened to portions of calls during routine maintenance.[3]

---

1. The changing of reels was effected by Guardsmark supervisory personnel. Only these Guardsmark employees were aware of the installation and use of the voice logger.

2. Scott St. Clair, a Bosch security official, testified that an FCC employee orally approved of Bosch's use of the voice logger. The district court allowed testimony to this effect into evidence for the sole purpose of allowing the jury to evaluate Bosch's actions as to punitive damages.

3. There was testimony at trial, the purpose of which was to imply that St. Clair had listened to the recordings, to the effect that St. Clair paid close attention to, and at times exhibited great

During the summer of 1989, Guardsmark supervisory personnel expressed their displeasure over Bosch's use of the voice logger. Bosch decided to discontinue use of the voice logger and, in late July of 1989, the equipment was ordered shut down.

In March of 1990, a Guardsmark employee notified Schaffner that there was a live microphone in the security office that could pick up conversations in the office and transmit them to the voice logger in the penthouse. Schaffner testified that he was unaware of any such capability but undertook an investigation, which revealed that, while the voice logger was indeed switched "off" and while no tape was loaded on the reels provided, when Schaffner turned up the voice logger's volume control, he was able to hear certain ambient noise from the security office. Subsequent investigation revealed that this resulted from a design anomaly of the attendant console. Even when no calls were being handled at the attendant console, the handset microphone picked up nearby noise; in particular, the handset microphone picked up voices, both on the telephone and otherwise, spoken in close proximity to the handset. The microphone transmitted what it picked up to the penthouse where, when the voice logger was active, it was recorded thereby. Even after the voice logger was deactivated, the sounds picked up by the handset microphone were transmitted to the penthouse and could be audited by turning up the voice logger's volume control. Schaffner and Scott St. Clair both testified that they were unaware of this anomaly until it was brought to their attention by Guardsmark's employee.[4]

Sanders had no knowledge of the voice logger until Schaffner's investigation of the

report of the open microphone in March of 1990.

## II.

■ We consider first Bosch's appeal. Pursuant to 18 U.S.C. § 2520, "any person whose wire or oral communication is intercepted, disclosed or used in violation of [the Act] may in a civil action recover from the person or entity which engaged in that violation such relief as may be appropriate." The district court found that Bosch, by using the voice logger, unlawfully "intercepted" plaintiff's wire or oral communications in violation of the Act.

"[I]ntentional intercept[ions]" of "wire, oral, or electronic communications" are proscribed by 18 U.S.C. § 2511(1).[5] The Act defines "intercept" to mean "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). "Electronic, mechanical, or other device" is, in turn, defined as

any device or apparatus which can be used to intercept a wire, oral, or electronic communication other than—

(a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business or furnished by such subscriber or user for connection to the facilities of such ser-

knowledge of, the private lives of the Guardsmark security personnel.

4. The Guardsmark supervisor testified that, in fact, he had previously informed St. Clair of the presence of the open microphone.

5. As relevant here, section 2511(1) explains that a violation of the Act is committed by

any person who—
    (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication; [or]

(b) intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical or other device to intercept any oral communication when—
    (i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communications; or

    (iv) such use or endeavor to use (A) takes place on the premises of any business or other commercial establishment the operations of which affect interstate or foreign commerce. . . .

vice and used in the ordinary course of its business....

18 U.S.C. § 2510(5)(a)(i).

■ The recording of a telephone conversation alone constitutes an "aural ... acquisition" of that conversation.[6] *See United States v. Truglio,* 731 F.2d 1123, 1131 (4th Cir.), *cert. denied,* 469 U.S. 862, 105 S.Ct. 197, 83 L.Ed.2d 130 (1984); *United States v. Seidlitz,* 589 F.2d 152, 157 & n. 17 (4th Cir.1978), *cert. denied,* 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 396 (1979). Thus, Bosch's recording of Sanders' phone conversations constitute "interceptions" under the Act unless the recordings were not effected "through the use of any electronic, mechanical, or other device." Bosch contends that it did not acquire Sanders' telephone conversations "through the use of any electronic, mechanical, or other device" because its use of the voice logger qualifies for section 2510(5)(a)(i)'s business-use exception.

The district judge, to whom the parties agreed to submit the question,[7] found that Bosch's use of the voice logger did not fall within the business-use exception. We agree.

To meet the business-use exception of section 2510(5)(a)(i), both of that section's prongs must be met. *Deal v. Spears,* 980 F.2d 1153, 1157 (8th Cir.1992). First, the voice logger must constitute a "telephone or telegraph instrument, equipment or facility, or a[ ] component thereof," either provided by, and installed by, BellSouth in the ordinary course of *its* business or, equivalently, supplied by Bosch for connection to BellSouth facilities; second, Bosch's use of the voice logger must fall within the ordinary course of its business. *Id.* We find neither prong established on the record before us.

■ The first prong is not met here because the voice logger [8] is not a "telephone or telegraph instrument, equipment or facility or a[ ] component thereof...." The record does not indicate that BellSouth sells equipment similar to Bosch's voice logger in the ordinary course of its business.[9] Moreover, even if it did, we could not characterize the voice logger as a "telephone or telegraph instrument...." The voice logger in no way furthers the plant's communication system. *See Williams v. Poulos,* 11 F.3d 271, 280 (1st Cir.1993) ("we are at a loss to see how the monitoring system used here, consisting as it did of 'alligator clips attached to a microphone cable at one end' and an 'interface

---

6. Bosch, in its briefs on appeal, challenged this statement of the law but, at oral argument, abandoned its challenge.

7. Only two issues were put to the jury: when Sanders discovered the taping for statute of limitations purposes, and whether punitive damages were appropriate.

8. Bosch urges that, in fact, the intercepting device is not the voice logger but rather the extension telephone lines installed by BellSouth. We disagree. The Eighth Circuit in *Deal v. Spears,* 980 F.2d at 1157–58, considered and rejected this argument with respect to a device similar to the one involved in the case at bar. Explained that court: "The calls would not have been heard or otherwise acquired—that is, intercepted—at all but for the recording device...." *Id.* at 1157–58. We find this reasoning persuasive.

Bosch relies heavily upon *Epps v. Saint Mary's Hospital of Athens, Inc.,* 802 F.2d 412, 415 (11th Cir.1986), where the Eleventh Circuit held that the interception device in the case before it was not the recording equipment, but the dispatch console to which the recorder was attached. The Eighth Circuit expressed its disagreement with *Epps* in *Deal,* 980 F.2d at 1157, and we find

the Eighth Circuit's position to be the better-reasoned one.

9. Section 2510(5)(a)(i) provides two alternatives according to which the first prong of the business-use exception may be satisfied: the equipment at issue may be either obtained from the telephone company or furnished by the telephone service subscriber. As the statute is crafted, only the former alternative requires that the telephone company provide the equipment in question in the ordinary course of its business.

Here, of course, because Bosch purchased the voice logger from a source other than BellSouth and connected it to extension telephone lines installed by BellSouth, the second alternative is implicated in the instant case. However, even if the second alternative does not include as a requirement that the telephone company provide the equipment in question in the ordinary course of its business is not a requirement under the second alternative, we believe that evidence as to whether such equipment is sold by the telephone company in ordinary course of its business is nevertheless relevant as at least some indication of whether the equipment in question is "telephone or telegraph instrument, equipment or facility, or any component thereof...."

connecting [a] microphone cable to a VCR and a video camera' on the other, can be considered to be a 'telephone or telegraph instrument, equipment or facility, or a[ ] component thereof' "); [10] *Deal v. Spears,* 980 F.2d at 1158 (dealing with a similar device).

Nor can we conclude that, as required by the business-use exception's second prong, the voice logger was used in the ordinary course of Bosch's business. Bosch attempts to justify 24-hour surreptitious [11] recording of phone lines on the ground that it feared bomb threats. We first note that the evidence of bomb threats received prior to the installation of the voice logger is scant; further, no bomb threats were received throughout the period that recordings were made. We therefore question whether the record evidences a business justification for the drastic measure of 24-hour a day, 7-day a week recording of telephone calls. [12]

**10.** The device found by the First Circuit not to qualify as a "telephone or telegraph instrument, equipment or facility, or a[ ] component thereof" in *Williams* bears great similarity to Bosch's voice logger. The device in *Williams* allowed for the sounds transmitted over a telephone line to be intercepted and recorded onto the audio portion of a videotape loaded into a nearby VCR. Onto the video portion of the videotape was recorded a picture of the VCR counter. 11 F.3d at 276. The video recording of the VCR counter performed a function similar to the voice logger's time-index tape reel, allowing a person to fast forward to a particular point on the tape where a desired audio conversation was located, *id.*

We would note that the First Circuit found "not helpful" to the user of the device an expert's testimony that, "though it was *unusual,* the components [of the device] *could* acceptably be used *with* telephone systems." *Id.* at 280 n. 13 (emphasis in original).

**11.** At page 7 of its reply brief, Bosch asserts that, in effect, the fact that the use of the voice logger was not disseminated was of no practical effect since "there were telephones readily available to the guards which were not recorded and to which their officers who knew about the recording could have directed them for their personal calls." If this is true, then we are led to wonder why Bosch did not itself simply disclose the use of the voice logger to all the Guardsmark personnel.

In fact, Guardsmark supervisors testified that they were instructed by St. Clair not to inform their underlings about the voice logger and St. Clair testified, and Bosch asserted at oral argument, that Bosch did not want the Guardsmark

■ Second, and of greater import, is the fact that Bosch never notified the security guards, other than the Guardsmark supervisors, that the recordings were being made. In light of the Act's clear purpose of protecting individuals' privacy interests, the determination of whether the "use" made of a surveillance device falls within the ordinary course of business so as to satisfy section 2510(5)(a)(i) necessarily entails examination of whether such "use" was covert or open. Covert use of a surveillance device must be justified by a valid business purpose.

Here, the justification advanced for the ongoing interception of telephone calls, *i.e.,* the fear of bomb threats, does not in any way explain the fact that Bosch failed to inform any Guardsmark personnel, other than the supervisors, of the use of the voice logger. [13] In short, there is no business reason asserted for the decision not to notify all the Guards-

personnel to learn that the voice logger was recording calls on certain phone lines lest persons telephoning in bomb threats might learn of that fact and telephone in the threats on other Bosch lines, *see infra* note 14.

**12.** We note that Bosch appears to have conceded this point below. The district judge, in the context of a discussion of whether recording a telephone call constitutes an "aural or other acquisition" of the communication, stated: "[A]ssuming that that is true now—without you admitting it, assuming that it's true, we all agree that you can't listen to private and personal conversations in toto, 24 hours a day, seven days a week." J.A. 281. Counsel for Bosch responded: "Yes, Sir. And we would agree to that." J.A. 282.

**13.** In *Watkins v. L.M. Berry & Co.,* 704 F.2d 577 (11th Cir.1983), the court of appeals held that an employer might, in the ordinary course of business, validly intercept an employee's calls, including personal calls, in order to deter the employee's use of the business line for personal calls. Such interception was valid only to the extent that the employer could listen only so far as necessary to determine whether a call was personal. Any additional interception would be unwarranted.

Here, of course, the justification for Bosch's interception of phone calls is completely unrelated to the deterrence of personal calls on company lines. Thus, to whatever extent *Watkins* might justify in appropriate circumstances extended, unannounced recording of telephone calls, it is, on the facts presented here, wholly inapposite.

mark employees of the use of the voice logger.[14]

We conclude that the district court correctly found that Bosch's use of the voice logger did not fall within the business-use exception of section 2510(5)(a)(i). Bosch's appeal, then, is without merit.

### III.

Sanders raises two issues in her cross-appeal. She first argues that the district court erred in finding no damages due for the period of time after Bosch had stopped the recording, but during which, due to a design defect which resulted in a live microphone being left on, ambient noise from the guards' office could have been heard in the security control room. Second, she argues that the district court's instruction to the jury on punitive damages was erroneous. We address Sanders' contentions *seriatim*.

### A.

■ As explained above, Bosch terminated the recording of phone conversations in July of 1989. Due to a defect in the design of the attendant console, however, the handset microphone remained able to pick up ambient noise in the guards' office and transmitted it to Bosch's security control room. The ambient noise could be audited by turning up the voice logger's volume control. Bosch officials were unaware of this odd "feature" until a Guardsmark security supervisor brought it to their attention; there is no evidence that any Bosch employee ever listened to, recorded, or otherwise acquired any conversations from the office by means of the open microphone. The district court found that there was no "interception" of any oral

communications, as defined by the Act, in this regard. On appeal, Sanders contends only that, even if no one listened to, or was even aware of, the transmissions of the conversations originating in the guards' office, those conversations were "intercepted" in violation of the Act merely by virtue of the fact that they were transmitted to the penthouse. She argues, in other words, that the Act, as applied here, does not require proof of listening or of preservation for listening purposes.

Sanders' argument fails for two reasons. First, the definition of "interception" explicitly requires "the aural or other acquisition of the *contents* of any ... oral communication...." 18 U.S.C. § 2510(4) (emphasis added). The Act defines " 'contents', when used with respect to any wire, oral, or electronic communication, [to] include[ ] any information concerning the substance, purport, or meaning of that communication." *Id.* § 2510(8). Although the statutory definition of "contents" is not all-inclusive, we are satisfied that, under the circumstances presented in the case at bar following the deactivation of the voice logger, Bosch never acquired the "contents" of any conversations taking place in the guards' office.

Second, section 2511 proscribes only "intentional[ ]" interceptions. 18 U.S.C. § 2511(1)(a), (b). *See Thompson v. Dulaney*, 970 F.2d 744, 748 (10th Cir.1992); *Malouche v. JH Management Co.*, 839 F.2d 1024, 1026 (4th Cir.1988) (Powell, J.) (holding that, prior to 1986 amendment when Congress replaced with "intentionally" the word "willfully" in section 2511, to establish a civil violation of section 2511, a plaintiff had to prove that any violation was intentional or undertaken with reckless disregard).[15] The Act thus "re-

---

14. St. Clair testified, and Bosch asserted at oral argument, that Bosch kept the use of the voice logger secret from all the guards except for the Guardsmark supervisors because of fear that full disclosure would somehow have reached potential perpetrators of bomb threats, allowing them to use lines other than those connected to the voice logger when telephoning in bomb threats. Even if this amorphous contention were in fact a valid business reason for concealing the use of the voice logger from the guards, its validity is belied by a statement found at page 7 of Bosch's reply brief. There it is explained: "[T]here were telephones readily available to the guards which were not recorded and to which their officers

who knew about the recording could have directed them for their personal calls."

15. This Court explained in *Malouche*:

[W]e ... hold that the word "willfully," as used in section 2511, was intended to be given its traditional meaning when used in a criminal statute. In this case, as civil liability under section 2520 depends on a violation of the willfulness standard of section 2511, we also hold that appellant was required to establish an intentional or reckless disregard of its legal obligation by appellee. Neither the language of the statute nor its legislative history suggest

quires that interceptions be intentional before liability attaches, thereby excluding inadvertent interceptions." *Thompson*, 970 F.2d at 748. Here, of course, the fact that the microphone was on was the result of a design defect and was not known to anyone. Thus, Sanders' argument is without merit.

### B.

On the issue of punitive damages, the district court instructed the jury that, in order to award punitive damages, it had to find by clear and convincing evidence that Bosch acted "willfully and wantonly." J.A. 422–23. Sanders claims that the district court erred in failing to deliver an instruction, agreed to by both Bosch and Sanders, under which the punitive damages would be proper were the jury to find it established by a mere preponderance of the evidence[16] that Bosch's conduct was "wanton, reckless or malicious." J.A. 454.

We find that, regardless of merit of Sanders' complaints, any error in the district court's instruction was harmless because, even under the preponderance standard, the jury would not have concluded that punitive damages were appropriate. There is scant evidence that any Bosch employees ever listened to any of Sanders' conversations and no evidence that the substance of any of Sanders' conversations was ever disseminated. Nor does the evidence suggest that the recording was ill-motivated. We do not believe, therefore, that the judge's instructions to the jury, whether they were erroneous or not, in any way affected the jury's resolution of the punitive damages question. *Cf. Deal v. Spears, supra*, 980 F.2d at 1159 (holding that, where "[t]here was no evidence that taped conversations were repeated verbatim, or that anything but vague substance was revealed," district court did not err in denying punitive damages; noted the court, "[i]t is difficult to conceive of a case less appropriate for punitive damages than this one").

### IV.

The judgment of the district court is affirmed in all respects.

*AFFIRMED.*

WIDENER, Circuit Judge, concurring in part and dissenting in part:

I concur in Part III of the majority opinion with respect to the cross-appeals of Mrs. Sanders. I respectfully dissent, however, from that portion of the opinion affirming the judgment against Robert Bosch Corp. (Bosch) for civil penalties for violation of the Federal Wiretapping Act, 18 U.S.C. §§ 2510–21 (the Act).

The issue in this appeal is the applicability and construction of section 2510(5)(a)(i) of the Act, the business-use exception. I am of opinion that Bosch's recording of incoming calls between January and July 1989, to detect bomb threats,[1] falls squarely within the

---

that Congress intended different standards of willfulness to apply in the civil and criminal context.
839 F.2d at 1026.

16. The district court based its decision to set the standard of proof as clear and convincing evidence based upon this Court's holding in *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95 (4th Cir.1991). Sanders contends that this was error. She notes that, in *Mattison*, this Court reviewed the jury instruction delivered with respect to a claim in a diversity case brought under South Carolina law, which requires clear and convincing evidence for punitive damages. Sanders argues that *Mattison* has no application in this case, which involves, not state law, but the federal Anti–Wiretapping Act.

Bosch concedes that the case at bar involves federal, and not South Carolina, law and that, as a consequence, *Mattison's* holding with respect to South Carolina law is irrelevant. It argues, however, that the federal Anti–Wiretapping Statute incorporates as interstitial federal common law the South Carolina rule that the propriety of punitive damages be established by clear and convincing evidence.

Because of our determination that any error in this regard was harmless, we need not address the merits of this dispute.

1. While the majority opinion denigrates the bomb threats as "claims," op. at 738, and the evidence thereof as "scant," op. at 741, the uncontradicted record shows that Bosch had between 16 and 21 bomb threats between 1974 and 1987. On the occasion of each such threat, the plant was evacuated either to the parking lot or cafeteria, causing the loss of production of between 400 and 1000 employees for periods of time varying from 3/4 of an hour to two hours. So the threats were real, as was the loss resulting

exception because the voice logger is not an "electronic, mechanical, or other device" as defined in the Act, 18 U.S.C. § 2510(5), and thus does not constitute "interception" as defined in the Act. See 18 U.S.C. § 2510(4).

Section 2510(5)(a)(i) excepts from the provisions of the Act the use of "any telephone ... instrument, equipment, or facility or any component thereof, ... furnished by [the] ... user for connection to the facilities of [a wire or electronic communication] service and used in the ordinary course of its business...." The majority notes that this is a two-pronged requirement: Bosch must show that the voice logger is a telephone instrument, equipment, or facility, or a component thereof, and that Bosch used the logger in the ordinary course of its business. The majority concludes, however, that neither prong has been satisfied. I disagree and will address each prong in turn.

### I. Telephone Instrument, Equipment, or Facility

Initially, I think the majority incorrectly characterizes the phrase "telephone or telegraph instrument or equipment" by stating that the voice logger does not "further[ ] the plant's communications system," which thereby renders the statutory phrase meaningless. It is patent to me that the logger does clearly further the plant's communications system. If monitoring a telephone system to detect bomb threats by telephone does not further a plant's communications system, then plain English to express the thought eludes me.

Not only does the majority decision so characterize the concept of a communications system, it is in any event indefensible on its own terms because it fails to compare the

logger with extension telephones, which it tacitly concedes fall within the exception.[2] I can conceive of no way to make such a distinction. The purpose of extension telephones, as used in the context present here, is to allow the receiver to listen to telephone conversations without being heard, in precisely the same manner that the logger was used by Bosch.

Additionally, the majority fails to construe the relevant provision of the Act to effectuate Congress' intent. Section 2510(5)(a)(i) exempts "any telephone ... instrument, equipment, or facility, or any component thereof" from the prohibitions of the Act. Congress thus intended the terms "instrument," "equipment," "facility," and "component" to have different meanings. The majority ascribes only one meaning to the entire provision, however: that extension telephones may be exempted.

While it is clear that an "instrument" is, at a minimum, a device which allows a person to make ordinary use of a telephone, i.e. a handset, receiver, intercom, etc., it is far from clear what Congress intended by the words "equipment" and "facility." Without venturing an opinion as to the precise meanings intended,[3] I would state the proposition that a device that is made and sold commercially, that plugs directly into a standard telephone jack, and that receives, records and converts electrical signals into sound is, if not a telephone "instrument," at the very least a form of telephone "equipment." In my view, such a result is required. Again, the majority avoids this conclusion only by deciding that

---

from them. How many threats it would take to satisfy the majority is not stated in its opinion; presumably an actual bomb planting would have been sufficient. But, in my view, Bosch did not have to wait that long and needlessly expose lives and property to very real threats of harm.

**2.** The majority appears to credit Mrs. Sanders' characterization of the business-use exception as applying only to extension telephones. Otherwise, the decision would nullify the exception altogether.

Mrs. Sanders repeatedly calls section 2510(5)(a)(i) the "telephone extension excep-

tion," (Appellee's Brf. at 14, 21, 24) but does not explain the rationale for the distinction she draws between telephone extensions and the voice logger. In fact, Mrs. Sanders states in her brief that "[t]o be a telephone instrument ... the equipment at issue must serve a *communication* function," (italics in original) and then immediately describes the exception as applying only to telephone extensions. She, like the majority, fails to explain how extensions, as used in the context of the Act, serve a communications function that the logger does not.

**3.** A review of the legislative history is unavailing to this end.

the logger serves no communication function at all.[4]

Finally, with respect to whether or not the device used in this case, the logger, was a "telephone or telegraph instrument, equipment or facility, or any component thereof" at least three cases have held that paraphernalia indistinguishable from that used here is within the terms of the statute. In *James v. Newspaper Agency Corp.*, 591 F.2d 579 (10th Cir.1979), the employer which performed the production, distribution and business functions for two city newspapers "decided to install a telephone monitoring device on the telephones in certain of its departments, particularly those departments dealing with the general public." 591 F.2d at 581. "[T]he reason for the installation was the concern by management over abusive language used by irate customers when called upon to pay their bills, coupled with the possible need to give further training and supervision to employees dealing with the public." 591 F.2d at 581. The court held that the installation of a monitoring device under those circumstances "comes squarely within the exception provided in 18 U.S.C. § 2510(5)(a)." 591 F.2d at 581. (The wording of the statute has been changed somewhat since *James* but in no way relevant here.) In *Briggs v. American Air Filter Co. Inc.*, 630 F.2d 414 (5th Cir. 1980), the employer decided to monitor the telephone calls of an employee because the "employee's supervisor ha[d] particular suspicions about confidential information being disclosed to a business competitor." 630 F.2d at 420. The monitoring device was "an attachment to a portable dictating machine" attached to an ordinary extension telephone. 630 F.2d at 416. The court held that that monitoring device came within the terms of the statute. In *Epps v. St. Mary's Hosp. of Athens Inc.*, 802 F.2d 412 (11th Cir.1986), a hospital monitored all calls "coming into or going out from the dispatch console ... on a large, double-reeled tape recorder." 802 F.2d at 413. It is at once apparent that the paraphernalia used in that monitoring was indistinguishable from that used in this very case. All emergency medical service calls were made from the dispatch console, and through that console the emergency medical service dispatchers notified the emergency medical technicians. The court held that the intercept was by virtue of the dispatch console, not the double-reeled recorder which had recorded the calls and that the console was within the terms of the statute.

I am therefore of opinion that the logger used by Bosch undoubtedly is a telephone instrument or equipment or facility, or component thereof, which falls within the purview of the business-use exception of the Act. It is a monitor, pure and simple, and to distinguish it from the exempted monitors in *James* and *Briggs* and *Epps* is so great a departure from logic that I may not agree to it.

## II. *Ordinary Course of Business*

The majority holds that even if the logger is a telephone instrument, equipment, or facility, or component thereof, Bosch's use of it was not in the ordinary course of business, as required for exemption from the Act by § 2510(5)(a)(i). Again, I disagree. The majority analyzes Bosch's use of the logger, including its covert nature and the fact that it was employed 24 hours a day, seven days a week, to determine if the use was justified in the circumstances. The continued use and the failure to notify Guardsmark employees are given as the reasons for denying the exemption. I think, however, that it is clear that Bosch's use of the logger was in the ordinary course of its business.

The 2510(5)(a)(i) exception, unlike the Fourth Amendment, does not require that an employer's use of intercepting devices be reasonable, but only that it be done in the ordinary course of business. Here, Bosch recorded all telephone calls on seven telephone lines around the clock in order to record bomb threats, obviously for the purpose of identifying a caller. I can see no reason why this should not be considered in the ordinary course of Bosch's business.

4. In the light of this discussion, it is unclear to me how one would initially arrive at the conclusion that the business-use exception applies only to communication-furthering devices, as Mrs. Sanders and the majority assume, since the statute uses no such language and in fact includes words such as "equipment" and "facility" that do not inherently imply a communication-furthering capacity but rather an auxiliary, peripheral, or support-oriented capability.

First, Bosch's desire to record bomb threats was clearly legitimate, since recording bomb threats is a valid way of collecting evidence against the callers. Voice spectrograph technology, a method by which an expert can compare a known voice to an unknown voice within a small margin of error, is admissible at criminal trials in this circuit and has been for years. See *United States v. Baller*, 519 F.2d 463, 465–67 (4th Cir.), *cert. denied*, 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975). In *Baller*, a clerk at a coal mine recorded four telephoned bomb threats, the last of which was traced by the telephone company to the defendant's house.[5] This court admitted the testimony of an expert regarding the voiceprint identification of the defendant from the tape-recorded telephone calls. Therefore, Bosch's recordings would, in the event of a bomb threat, be admissible in court against the caller.

Second, as I have stated previously, see *supra* note 1, there was ample reason for Bosch to be concerned about the possibility of bomb-threat calls. Once again, Bosch had repeatedly suffered significant economic losses resulting from thousands of man-hours of downtime while the company investigated numerous bomb-threat calls. It simply cannot validly be argued that this did not create a legitimate business concern, or that attempts to counteract it were not, in the light of Bosch's history, in the ordinary course of business.

Many cases have found that recording or otherwise intercepting calls for reasons much less serious than concern for potential bomb threats is in the ordinary course of business. See *Epps v. Saint Mary's Hosp. of Athens, Inc.*, 802 F.2d 412 (11th Cir.1986) (finding that the monitoring of a call between employ-ees during working hours that involved disparaging remarks regarding company management was within the exception, and stating that "[c]ertainly the potential contamination of a working environment is a matter in which the employer has a legal interest"); *Briggs v. American Air Filter Co.*, 630 F.2d 414, 420 (5th Cir.1980) (holding that monitoring telephone calls is in the ordinary course of business where the employer has reason to suspect an employee of disclosing confidential information to business competitor); *James v. Newspaper Agency Corp.*, 591 F.2d 579, 581 (10th Cir.1979) (finding that recording "abusive language used by irate customers ... coupled with the possible need to give further training and supervision to employees dealing with the public" was in the ordinary course of business).

Third, the manner in which Bosch endeavored to record bomb threats was entirely appropriate. Bosch's tape recording of all conversations on selected telephone lines and reusing the tapes every week was justified, because bomb threats may be made at any hour, and are likely to come in on telephone lines the numbers of which are known to the public.[6] Further, the decision to keep the use of the logger secret from the people using the lines is a reasonable business judgment; had the employees known, there was a risk that members of the public might discover the logger.[7] Since anyone making bomb threats at Bosch's plant was likely to be acutely interested in the goings-on at the plant, it was not unreasonable for Bosch to fear that any public knowledge might thus reach the attention of potential threat-callers. These people might then attempt to call other, unmonitored, Bosch lines or to forego calling altogether before planting a bomb.[8]

---

5. Although the recording in *Baller* was done in isolation and with the consent of the mine's employee, I cannot overlook the similarities between this case and that regarding the business purpose requirement. *Baller* clearly demonstrates the legitimacy and efficacy of tape recording bomb threats, which was precisely Bosch's purpose here.

6. The majority states that 24–hour recording is "drastic" and further that Bosch concedes this point. I do not agree. Bosch conceded that "you can't listen to private and personal conversations in toto, 24 hours a day." Op. at 741, n. 12. Twenty-four-hour recording is a virtual imperative for the purpose of recording bomb threats, since they are at best sporadic and un-predictable. Whether *listening* to the tapes would be reasonably related to this purpose is an entirely different issue, and is not relevant since there is no evidence that anyone at Bosch did so.

7. It is also reasonable for Bosch to have suspected the possibility that someone inside the company was making the threat calls, since disgruntled employees are a likely group to harbor ill will against the company. In that case, any notice of the logger to employees would be even more likely to have harmful results.

8. The majority states that, "[i]n short, there is no business reason asserted for the decision" to keep the use of the logger a secret. It supports

Moreover, I find it quite relevant that Bosch was not recording the calls of particular employees, or for any purpose related to employment or personnel matters. In this regard, the case is distinguishable from most of the business-use-exception cases relied on by either party. Where a telephone line used at least primarily for business purposes is recorded indiscriminately for a purpose relating not to personnel or employment but only to the conduct of incoming callers to identify a threatening bomber, courts should be more willing to find the use to be in the ordinary course of the employer's business, since no particular person's privacy is being intentionally invaded.

### III. *Conclusion*

I would hold that Bosch did not violate the Federal Wiretapping Act because it used a telephone instrument or equipment, or component thereof, to intercept calls in the ordinary course of its business. I would reverse the judgment against Bosch for civil damages under 18 U.S.C. § 2520. I therefore respectfully dissent from so much of the opinion as affirms the judgment against Bosch, and concur in the remainder of the opinion.

On Petition for Rehearing with Suggestion for Rehearing In Banc

Jan. 24, 1995

The appellant, Robert Bosch Corporation, has filed a petition for rehearing with suggestion for rehearing in banc.

A majority of the panel voted to deny rehearing.

A member of the Court requested a poll on the suggestion for rehearing in banc, and a majority of the judges voted to deny rehearing in banc. Judges Russell, Widener, Wilkinson, Hamilton, and Williams voted to rehear the case in banc, and Judges Ervin, Hall, Murnaghan, Niemeyer, Luttig, Michael, and Motz voted against rehearing in banc. Judge Wilkins was disqualified from participation in this appeal.

The Court denies the petition for rehearing with suggestion for rehearing in banc.

Entered at the direction of Judge Russell for the Court.

this contention with a footnote, in which it calls the above-mentioned reasoning, articulated by Bosch, "amorphous," and proceeds to explain that the reasoning is in any event "belied" by Bosch's statement that the few employees who did know about the logger could have directed the employees using the monitored telephones to make personal calls on unmonitored lines. See slip op. at 742, n. 14. I cannot join this reasoning. The statement referred to in no way "belies" the argument that overt use of the logger might result in potential threat-callers using unmonitored lines to make their threats; in fact, I find it entirely unrelated to that argument. I am therefore at a loss to understand the majority's conclusion that there was no business reason to keep the use of the logger relatively secret.