**Lourdes Rachel ARIAS, Plaintiff,**

v.

**MUTUAL CENTRAL ALARM SERVICES, INC., et al., Defendants.**

**Louis J. ALBERO, Plaintiff,**

v.

**MUTUAL CENTRAL ALARM SERVICES, INC., et al., Defendants.**

**Nos. 96 Civ. 8447(LAK), 96 Civ. 8448(LAK).**

United States District Court, S.D. New York.

Sept. 11, 1998.

Robert A. Horn, for plaintiffs.

Robert M. Trien, Harvis & Trien, LLP, for defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

The plaintiffs in this case seek recovery under Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (the "Act"), as amended, for allegedly unlawful eavesdropping by their employer on private con- versations in the workplace for which plain- tiffs used the employer's telephones. The genesis of the dispute, however, has as much to do with the perils of marrying the boss's granddaughter and then embarking on an extramarital relationship with a co-worker as it does with the law of privacy in the work- place. In the last analysis, no one involved in this sordid tale has anything to brag about.

Defendants move for summary judgment dismissing the complaint. Plaintiffs move for leave to amend the complaint.

### Facts

As this is a motion for summary judgment, the facts must be viewed in the light most favorable to the non-moving parties. Defen- dants argue extensively that the plaintiffs knew of and consented to the alleged inter- ception of their calls. It is quite obvious, however, that there are material issues of fact as to consent. Hence, the Court focuses only on the other ground advanced by the defendants as to which the following facts are undisputed.[1]

#### Mutual and Albero

In 1990, Norman Rubin, who had had prior experience in the business, formed Mutual Central Alarm Services, Inc. ("Mutual")[2] to provide central station alarm services—that is, it monitors burglar, fire and perhaps other alarms maintained in customer premises and alerts police or other emergency services when a signal is received.

On August 19, 1990, shortly after Mutual was formed, Rubin hired plaintiff Louis J. Albero as a bookkeeper and office manager.[3] Albero was hired principally because of his relationship with Rubin's granddaughter, Il- ene Kassman.[4] While it is not clear from the record whether Albero and Kassman were married at the time Mutual hired Albero,

---

1. Plaintiffs' affidavits contain assertions as to facts supposedly learned from plaintiffs' attorney and others. *E.g.,* Albero Aff. ¶ 15. Rule 56(e) requires that affidavits on summary judgment motions affirmatively demonstrate the compe- tence of the affiant and admissibility in evidence of the information set forth. This applies to opposing as well as moving papers. *Raskin v. Wyatt,* 125 F.3d 55, 65 (2d Cir.1997). The Court

therefore disregards all of these materials, which are inadmissible hearsay.

2. Rubin Aff. ¶ 18.

3. *Id.* ¶ 22.

4. *Id.*

they were married during the events critical to this matter.

## The Telephone Monitoring

### Monitoring in the Central Station Alarm Industry

The central station alarm business involves sensitive communications between the alarm company and its customers. Information provided by customers to alarm companies would be of great assistance to burglars and other criminals, who often seek to enlist central station personnel in aid of their illegal activities. Alarm companies therefore have an important interest in the fidelity and discretion of their employees. Moreover, the risk of liability for central station companies should their employees fail to summon emergency help promptly after an event is reported is substantial. They are at risk also of claims by customers falsely or mistakenly asserting that an event was reported when in fact no such report was received. Complete records of calls made to and from central stations therefore are important tools for their operators to ensure that their personnel are not divulging sensitive customer information, that events are reported quickly to emergency services, and that customer claims regarding events are verifiable.[5]

These considerations have had a substantial effect on industry practices. Underwriters Laboratories, which sets standards for central station alarm companies, recommends that they record telephone line traffic.[6] The New York City Fire Department requires that central station signaling units such as Mutual maintain automatic recording equipment on lines used to communicate with it.[7] Hanover Insurance, a leading underwriter of burglary risks in the United States, regards the recording of telephone communications between the central station, the subscriber and emergency responders as "essential" and strongly recommends the practice.[8] Not surprisingly, it is undisputed that "the

industry wide practice" is to "monitor[ ] and tap[e] all incoming and outgoing telephone conversations to which the [alarm] company's central station personnel [are] parties."[9]

### Mutual's Practices

There is no doubt that Mutual employees used company telephones for personal as well as business calls. Indeed, in May 1992, Mutual circulated a memorandum to its employees stating that employees had abused the privilege. The memo insisted that no personal calls be made without approval of the shift manager and that employees' family members be told to refrain from calling employees at work absent a pressing reason.[10]

When Mutual began operations in 1990, it acquired a Dictaphone 9102 machine which is capable of recording on ten different channels. Initially, it was connected to individual telephones in Mutual's small office, although the record does not disclose the lines to which it was attached. Hence, the record does not disclose whether or to what extent personal calls of employees were recorded at the outset of Mutual's operations.

In late 1993 or early 1994, the Dictaphone 9102 was connected to all ten telephone lines that come into Mutual's premises.[11] Since that date, all calls originating or received at Mutual—business or personal—have been recorded.

The procedure for recording, as one might expect, is entirely routine. The company has 30 reel-to-reel tapes, each capable of recording the telephone traffic for a 24 hour period. They are numbered consecutively from 1 to 30. A new tape is placed on the Dictaphone every day and records all conversations for 24 hours. After tape number 30 is recorded, Mutual begins recording again on tape number 1. Thus, recorded conversations are kept for 30 days and then erased by the

5. *Id.;* Prevas Aff. *passim.*

6. Rubin Aff. ¶ 10 & Ex. 5.

7. *Id.* ¶ 14 & Ex. 9.

8. *Id.* ¶ 17.

9. *Id.* ¶ 8.

10. Rubin Reply Aff. ¶ 3 & Ex. 1.

11. *Id.* ¶ 18.

recording of a new day's traffic over each tape.[12]

## The Emergence of the Dispute

### Arias' Resignation and Threats

Mutual hired plaintiff Lourdes Rachel Arias in September 1993 as an administrative assistant.[13] Some time in 1995, she began seeking a raise.[14] Unable to obtain an increase, she resigned on August 23, 1995.[15] Nevertheless, she made it plain that she expected Mutual to acquiesce in her collecting unemployment benefits, which of course would have an adverse effect on Mutual's unemployment insurance payments, despite the fact that she had resigned. In her parting letter to Joel Cohen, Mutual's president, she stated that she would be making a claim for unemployment benefits and that she did "not expect any opposition from you." [16] She made clear also that she would file an EEOC complaint if Mutual did not go along with her demand.[17] Her letter took pains as well to point out that she did not hold Albero responsible for her situation.[18]

On September 6, Mutual had Albero fax a report to the appropriate unemployment insurance authority stating that Arias had resigned.[19] Later that day, Arias telephoned Cohen to inquire whether Mutual had processed her unemployment claim and, if so, what it had said. Cohen responded that Mutual had reported that Arias had resigned. Arias responded that she had taken copies of Mutual documents when she had left and that she "hoped that [Mutual was] 'clean.' " [20]

On September 8, 1995, two days after Arias' call to Cohen, Arias telephoned Rubin and claimed—for the first time—that Cohen had sexually harassed her. She stated that she intended to make a claim to that effect.[21]

Rubin consulted counsel as to the cost of defending such a suit. He then told Albero to call Arias and find out what she was looking for. Albero quickly reported back that Arias would settle her claims for $3,000 and an agreement by Mutual not to contest her unemployment claim.[22]

### Suspicion Falls on Albero

This incident caused Rubin to become suspicious of Albero. According to Rubin. Albero seemed to know Arias' home number and reported back as to her settlement demand very quickly. The manner in which he discussed her settlement position heightened Rubin's concern. So Rubin asked another employee to locate the telephone call between Albero and Arias on the Dictaphone tape. The tape revealed that Albero began the conversation by telling Arias that the call was being taped, which fed Rubin's concern that Albero was not a loyal employee.[23] So Rubin decided to investigate further.

The further investigation revealed a number of conversations between Albero and Arias on four other Dictaphone tapes. These revealed that Albero, who still was married to Rubin's granddaughter although engaged in divorce or separation negotiations, "had a social and sexual relationship with Arias that went back 1½ years" and that Albero told Arias on one occasion that "he was on Arias' side in her controversy with Mutual." [24]

12. *Id.* ¶¶ 19–20.

13. *Id.* ¶ 25.

14. Arias Aff. ¶ 15.

15. *Id.*

16. Rubin Aff. ¶ 25 & Ex 20 (Letter, Arias to Cohen, 8/23/95).

17. *Id.*

18. *Id.*

19. *Id.* ¶ 26 & Ex. 21 (Memo, Cohen to Albero, 9/6/95).

20. *Id.*

21. *Id.* ¶ 27; Albero Aff. Ex. E–1.

22. *Id.* ¶ 28; *see* Albero Aff. ¶ 14 & Ex. D. Although plaintiffs do not dispute Rubin's contention that it was Albero who reported Arias' position to him, Albero Ex. D is susceptible of the interpretation that Albero's call to Arias prompted a call by Arias to Rubin in which she, not Albero, conveyed her settlement demand. But nothing turns on this.

23. *Id.* ¶¶ 29–31 & Ex. 23 (9/8/95 Arias–Albero transcript).

24. *Id.* ¶ 31.

Rubin nevertheless did not then fire Albero because his granddaughter feared that such action would have an adverse impact on her financial settlement with Albero.[25]

### The Settlement with Arias

Despite the discovery that Albero and Arias were involved with one another. Rubin decided to accede to Arias' demands because the cost of doing so was less than that of defending a litigation.[26] On September 8 or 11, 1995, Rubin called Arias, accepted her proposal and asked her to come to the office to sign papers that he was preparing.[27]

Arias arrived for that purpose on September 12, 1995. Rubin took her into a conference room with Albero, gave her some documents to sign, and told her that the deal would have to be done that day if she wanted her money. Arias said that she wanted to discuss the documents with Frank Hernandez, a cousin and non-lawyer who worked for the attorney who was representing Albero in his matrimonial dispute, and telephoned him from the conference room. She claims that Rubin refused to leave the room while she did so, but she nevertheless proceeded to describe the gist of the papers to him. Fernandez said that he had no problem with the papers and she proceeded to sign and take Mutual's check for $3,000.[28]

The two documents signed by Arias on that occasion were a brief settlement agreement and a standard printed form of general release. The former recited that Arias "has made certain claims of improper actions on the part of some employees of Mutual," that Mutual wished to avoid litigation, and agreed that Arias would withdraw her allegations in exchange for $3,000.[29] By the latter, Arias released Mutual, Rubin, Cohen and another executive from, *inter alia*, all "causes of ac-

tion, ... [and] claims ... whatsoever, which against the RELEASEE, the RELEASOR ... ever had, now have or hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this RELEASE."[30]

### Albero's Activities

In September 1995, Albero observed Cohen and two other Mutual employees go into Rubin's office and close the door. He claims that he heard voices coming through the door which were not those of the persons who were in the office. While it is unclear whether he heard them playing tapes of conversations in which Albero was able to identify the participants or merely made assumptions, Albero was convinced that they listened to recorded conversations between Albero and Arias after she left the company and to conversations between Albero and the offices of the lawyer representing him in his matrimonial dispute with Rubin's granddaughter.[31]

A few days later, Albero went into Rubin's office where he found two cassette tapes dated August 24, 1995 with Albero's name on them. He surreptitiously took them, duplicated the contents, and returned them to Rubin's desk.[32] Deciding to fight what he perceived to be fire with fire, Albero then concealed a recording device on his person and, on September 29, 1995, taped a conversation among himself, Rubin and Cohen.[33] While much of the conversation has nothing to do with this suit, Rubin at one point complained that Arias had made threats to "get" Mutual despite the fact that the company had paid her off and inquired as to "[w]hat more she could want."[34] This led to Albero complaining that the company had taped his calls and to his saying that "there

---

25. *Id.* ¶ 32.

26. *Id.* ¶ 33.

27. Arias Aff. ¶ 20.

28. *Id.* ¶¶ 21–27.

29. *Id.* Ex. A.

30. *Id.* Ex. B.

31. Albero Aff. ¶ 22.

32. He copied other conversations as well. *Id.* ¶¶ 24–27. Albero's affidavit refers here to Exs. H, I, J, J–1, K, K–1. Exs. H and I appear to be identical. Exs. J, J–1, K and K–1 either were not provided to the Court or have gone astray in the Clerk's office.

33. *Id.* ¶ 29.

34. Albero Aff. Ex. L–1, at 8.

are a couple of conversations that I know … the three of you listened to." [35]  Rubin acknowledged that that was so, and ultimately seemed to admit that he had listened to a recorded conversation that involved Albero and his attorney.[36]

*Albero's Termination*

On October 5, 1995, Mutual fired Albero. On the same day, Albero told Rubin that Arias intended to make a claim against Mutual arising from its having recorded her telephone calls.[37]  These actions followed.

## Discussion

### I.  The Motion for Summary Judgment

#### A.  Title III

Title III of the Act, with exceptions not here relevant and in pertinent part, makes it unlawful intentionally to (a) intercept any wire, oral or electronic communication "through the use of any electronic, mechanical, or other device," (b) use "any electronic, mechanical, or other device" to do so, or (c) disclose or use the contents of any wire, oral or electronic communication obtained through interception in violation of the Act.[38]  One who violates the act is subject to declaratory and injunctive relief, damages, and a reasonable attorneys' fee.[39]  As often is the case with such highly technical legislation, however, the devil is in the details.

The telephone conversations in which Arias and Albero participated and that were automatically recorded by the Dictaphone 9102 were oral communications within the

meaning of the Act. Nor do defendants deny, on this motion, that conversations were "intercepted."  Thus, the question presented here is whether the defendants used an "electronic, mechanical, or other device" to intercept plaintiffs' communications.

The statute defines "electronic, mechanical, or other device" in relevant part as:

"any device or apparatus which can be used to intercept a wire, oral, or electronic communication other than—

"(a) any telephone or telegraph instrument, equipment or facility, or component thereof, (i) furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business *or furnished by such subscriber or user for connection to the facilities of such provider of wire or electronic communication service and used in the ordinary course of its business* … " [40]

Assuming, for the moment, that any conversations intercepted by the defendants were intercepted by the Dictaphone 9102,[41] plaintiffs, in order to prevail, would have to prove that the Dictaphone 9102 was a "device or apparatus which can be used to intercept a wire, oral, or electronic communication," and either (1) it was not a "telephone or telegraph instrument, equipment or facility, or component thereof," or (2) Mutual did not intercept conversations with it in the ordinary course of its business.[42]

---

**35.**  *Id.* at 10–12.

**36.**  *Id.* at 12–15.

**37.**  Rubin Aff. ¶ 36.

**38.**  18 U.S.C. § 2511(1).

**39.**  *Id.* § 2520(a).

**40.**  18 U.S.C. § 2510(5)(a) (emphasis added).

**41.**  This is not free from doubt.  *Compare, e.g., Epps v. St. Mary's Hosp.,* 802 F.2d 412, 415–16 (11th Cir.1986), and *United States v. Harpel,* 493 F.2d 346, 350 (10th Cir.1974), *with Sanders v. Robert Bosch Corp.,* 38 F.3d 736, 740 n. 8 (4th Cir.1994), *Deal v. Spears,* 980 F.2d 1153, 1157–58 (8th Cir.1992), and *Pascale v. Carolina Freight Carriers Corp.,* 898 F.Supp. 276, 279–80 (D.N.J. 1995).  As the parties have not addressed this

issue, however, the Court declines to reach it on this motion.

**42.**  The relevant portion of 18 U.S.C. § 2510(5) often has been referred to as the telephone extension/business use defense.  That, however, is a misnomer.  It is plaintiffs' burden to make out the elements on their claim, which in this respect includes proof that the Dictaphone 9102 is an "electronic, mechanical, or other device"—a conclusion that may be reached only if plaintiffs establish that it is telephone equipment and that it was not used in the ordinary course of Mutual's business.  This conclusion, moreover, is reinforced by the fact that the statute specifically defines certain circumstances as constituting defenses.  18 U.S.C. § 2520(d), thus implying that only the circumstances there specified are propositions on which a defendant bears the burden of proof.

**414**

Plaintiffs bear the burden of proof at trial on the question whether the Dictaphone 9102, assuming it was the intercepting device, constitutes a "telephone or telegraph instrument, equipment or facility, or component thereof" and have offered no such evidence here. Nevertheless, this is a motion for summary judgment, so defendants here bear the initial burden of showing that there is no genuine issue of fact and that they are entitled to judgment as a matter of law.[43] As they have offered no evidence concerning whether the Dictaphone 9102 is a "telephone or telegraph instrument, equipment or facility, or component thereof," and the answer is far from self evident, their motion for summary judgment cannot be granted. Rule 56(d), however, provides in substance that where a motion for summary judgment cannot be granted, the Court nevertheless may ascertain what material facts exist without substantial controversy and enter an order accordingly. It therefore remains to consider whether the ordinary course of business issue is ripe for summary judgment. In considering this issue, it is important to focus on what precisely constituted the interception, if interception there was, of plaintiffs' conversations.

As originally enacted, the statute defined "intercept" as "the aural acquisition of the contents of any ... oral communication."[44] "Aural" means "of or pertaining to the ear or the sense of hearing."[45] Hence, the Ninth Circuit held in *Greenfield v. Kootenai County*[46] that calls that were recorded automatically but never listened to were not "intercepted," as their contents were not aurally acquired.[47] While the Electronic Communications Privacy Act of 1986[48] amended the definition of "intercept" to read, in relevant part, "aural *or other* acquisition,"[49] the legislative history strongly indicates that Congress did not intend to change the definition of "intercept" in any respect relevant here.[50] Thus, assuming that *Greenfield* is good law, the issue would be whether and to what extent defendants *listened* to plaintiffs' calls in the ordinary course of business. On the other hand, if the amended statute were given an entirely literal reading, it would be arguable that the recording of the calls constituted interception because the recording was an "other acquisition"—in which case,

43. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); WILLIAM W SCHWARZER, THE ANALYSIS AND DECISION OF SUMMARY JUDGMENT MOTIONS 45–46 (1991).

44. 18 U.S.C.A. § 2510(4) (1970).

45. *United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir.1992), *cert. denied*, 506 U.S. 847, 113 S.Ct. 140, 121 L.Ed.2d 92 (1992) (quoting *Webster's New International Dictionary* 182 (2d ed. unabr.1957)).

46. 752 F.2d 1387, 1389 (9th Cir.1985).

47. *Accord, United States v. Seidlitz*, 589 F.2d 152, 157 n. 17 (4th Cir.1978) (traces of telephone communications not interceptions because (a) "sounds [not used] in retrieving information", and (b) " '[t]he words "aural acquisition" literally translated mean to come into possession through the sense of hearing ...' ") (quoting *Smith v. Wunker*, 356 F.Supp. 44, 46 (S.D.Ohio 1972)); *United States v. Cheely*, 814 F.Supp. 1430, 1441 (D.Alaska 1992), *aff'd without consideration of the point*, 21 F.3d 914 (9th Cir.1994), *opinion amended and superseded without consideration of the point*, 36 F.3d 1439 (9th Cir.1994); *see Steve Jackson Games, Inc. v. U.S. Secret Service*, 36 F.3d 457, 460–62 (5th Cir.1994); *Rodriguez*, 968 F.2d at 136 (situs of interception is "place where the contents of a wire communica-

tion are first to be heard and understood by human ears other than" those of parties); *contra*, *Sanders v. Robert Bosch Corp.*, 38 F.3d 736, 740 (4th Cir.1994) ("recording of a telephone conversation alone constitutes an 'aural acquisition' "); *Pascale*, 898 F.Supp. at 279. *Sanders*, it should be noted, relied for its quoted statement on *Seidlitz* and *United States v. Truglio*, 731 F.2d 1123, 1131 (4th Cir.), *cert. denied*, 469 U.S. 862, 105 S.Ct. 197, 83 L.Ed.2d 130 (1984). As already indicated, however, *Seidlitz* actually suggests a contrary conclusion. *Truglio* involved a recording of a conversation, but the recording was received in evidence and played at a criminal trial. The contents of the conversation therefore were acquired aurally. It therefore does not support the proposition for which it was cited, at least in circumstances in which recorded conversations are not heard by a human ear. *Pascale* merely relied upon *Sanders* without discussion.

48. 100 Stat. 1848.

49. 18 U.S.C. § 2510(4) (emphasis added).

50. *Steve Jackson Games, Inc.*, 36 F.3d at 461–62 ("Congress did not intend to change the definition of 'intercept' as it existed at the time of the amendment"); S.REP. No. 99–541, 99th Cong., 2d Sess. 13 (1986), *reprinted in* 5 U.S.C.C.A.N. 3555, 3567 (1986).

the issue would be whether the *recording* was in the ordinary course of business.

The parties on this motion have assumed without discussion that calls were intercepted. They therefore have not focused on whether the interception was the recording or the listening, and the Court declines to pass on that issue without the benefit of briefing. Nevertheless, the case may be narrowed in certain respects in view of the lack of genuine issues of fact concerning most of the ordinary course of business issues.

Viewing the evidence in the light most favorable to the plaintiffs, one or more of the defendants listened to two groups of calls. The first included Albero's September 8, 1995 call to Arias to ascertain her settlement position and the conversations just preceding which revealed the relationship between Albero and Arias. The second were the conversations that Albero claims he overheard Cohen and others monitoring in Rubin's office later in September 1995, conversations that Rubin acknowledged included a call involving Albero and his attorney.

■ The September 8 call, the first to which Rubin listened, was a business call made at Rubin's request. He listened to it only because he had reasonable grounds to suspect that Albero was a faithless employee who was cooperating with Arias in threatening or asserting claims against Mutual. Albero's warning to Arias at the outset that the call was being recorded, Rubin concluded, was designed to warn her against making any compromising statement. His suspicions therefore were enhanced by the call, and the call gave further cause to listen to the few earlier calls in order to determine whether his suspicion of disloyalty by Albero was justified. He thus had a legitimate interest in protecting the company by using the recordings for one of their intended purposes— determining the loyalty of a Mutual employee. As the Eleventh Circuit held in *Briggs v. American Air Filter Co.*,[51] an employer who has specific suspicions as to whether an employee is divulging the employer's confidential information and who listens to the employee's call for a limited time for the pur-

pose of determining whether the suspicions are grounded in fact does so in the ordinary course of business.[52] Accordingly, assuming that the listening was the interception, the Court holds that the first group of conversations was acquired in the ordinary course of business.

■ This conclusion does not control the second group of conversations. Viewing the evidence in the light most favorable to the plaintiffs, the defendants could be found to have listened to those conversations for quite different purposes. Once Rubin discovered that Albero and Arias were having an affair and that Albero had been unfaithful to his granddaughter, a trier of fact would be entitled to conclude that his interest in the Albero–Arias conversations went beyond business into the personal sphere. Rubin's acknowledgment that he listened to a recording of a conversation between Albero and his lawyer concerning his divorce or separation proceedings with Rubin's granddaughter would permit a finding that these conversations were audited for the purpose of assisting Rubin's granddaughter in obtaining a better matrimonial settlement. Accordingly, defendants certainly are not entitled to a determination, as a matter of law, that the second group of conversations was listened to in the ordinary course of business.

The alternate hypothesis—that the interception consisted of the recording, not the listening—presents the matter in a different light. There is no genuine issue as to the facts bearing on whether the recording of the conversations in question was done in the ordinary course of business. All calls to and from Mutual's premises were recorded, 24 hours a day and seven days a week. The recording was in accordance with industry standards designed to provide a record that customer alarms were dealt with appropriately, that emergency services were dispatched in a proper and timely way, to guard against faithless employees, and to protect against erroneous or fraudulent customer claims. It served legitimate business interests, some closely related to public safety.

**51.** 630 F.2d 414 (5th Cir.1980).

**52.** *Id.* at 420.

There are relatively few cases pertinent to the application of the ordinary course of business doctrine but they are instructive. In *United States v. Van Poyck*,[53] the Ninth Circuit held that the routine monitoring of inmate telephone calls by federal prison authorities was within the ordinary course of their duties.[54] In *Campiti v. Walonis*,[55] the First Circuit rejected an ordinary course of business argument in a prison monitoring case because the call in question was not routinely monitored and, indeed, was "an exceptional course of conduct."[56] And in *Briggs v. American Air Filter Co.*,[57] the Sixth Circuit held that a branch manager's use of an extension phone to listen in on the conversation of a subordinate whom he had reason to believe was disclosing confidential information was in the ordinary course of business.

These cases thus suggest that ordinary course of business has very much the same meaning in this statute as it does in the myriad of other legal contexts in which it is used—an action is taken in the ordinary course of business if it is a routine activity of the business in furtherance of a legitimate business goal.[58] Indeed, our own Circuit has held that a husband's use of an extension telephone and a recording device to tape his estranged wife's calls to their child in the context of extended matrimonial discord "certainly" was in the ordinary course of the husband's business.[59]

To be sure, there are other strains in the ordinary course of business cases. Perhaps the strongest case for plaintiffs is *Sanders v.* *Robert Bosch Corp.*,[60] in which the Fourth Circuit rejected a contention that an industrial plant's routine recording of calls to its security office, motivated by concern regarding bomb threats, was in the ordinary course of its business.[61] But the bases on which it did so are unpersuasive, at least in this in this context and this circuit.

The *Sanders* court relied first upon its view that the concern about bomb threats, which it viewed as ill-supported, did not justify 24 hour per day, 7 day per week recording—a proposition that it construed the defendant to have conceded.[62] Here, on the other hand, the business justifications for the recording—as distinguished from some of the listening—are more compelling.

Second, *Sanders* took the view that the failure of the defendant to notify the personnel working in the office in which the calls were recorded was inconsistent with the recording having been done in the ordinary course of business. But it is impossible to reconcile that view with the statute, as the Second Circuit made clear in *Anonymous*. Section 2511(2)(d) provides an explicit exception from liability for interceptions which are consented to by one of the parties to the intercepted conversation.[63] To construe the ordinary course provision as applying only where one of the parties to the intercepted conversation consented "would render the ... exemption meaningless, since interceptions which have the consent of one of the parties to the conversation are already explicitly exempted from coverage by the Act in 18 U.S.C. § 2511(2)(c) and (d)."[64]

**53.** 77 F.3d 285 (9th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 276, 136 L.Ed.2d 199 (1996).

**54.** *Id.* at 291–92. *Accord, United States v. Paul*, 614 F.2d 115, 117 (6th Cir.1980), *cert. denied*, 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1980); *United States v. Feekes*, 879 F.2d 1562, 1565–66 (7th Cir.1989).

The ordinary course of business qualification to the definition of "electronic, mechanical, or other device" applies not only to law enforcement officers, but to telephone subscribers and users generally. 18 U.S.C. § 2510(5)(a).

**55.** 611 F.2d 387 (1st Cir.1979).

**56.** *Id.* at 392.

**57.** 630 F.2d 414 (5th Cir.1980).

**58.** *See, e.g., Management Technologies, Inc. v. Morris*, 961 F.Supp. 640, 648 (S.D.N.Y.1997) (collecting cases).

**59.** *Anonymous v. Anonymous*, 558 F.2d 677, 678–79 (2d Cir.1977).

**60.** 38 F.3d 736.

**61.** *Id.* at 741–42.

**62.** *Id.* at 741 & n. 12.

**63.** 18 U.S.C. § 2511(2)(d).

**64.** *Anonymous*, 558 F.2d at 679 n. 5.

Apart from *Sanders,* plaintiffs' strongest authority is *Deal v. Spears,*[65] although the case is not unequivocally supportive of them. The defendants there sought to defend, on ordinary course grounds, their having recorded and listened to 22 hours of calls made by their employee on the ground that they had reason to suspect the employee's involvement in a robbery of their liquor store on the ground that their actions were taken in the ordinary course of their business. The Eighth Circuit acknowledged that the defendants had a legitimate interest in monitoring the calls to the extent the calls related to their business concerns. Unlike the Fourth Circuit in *Sanders,* moreover, it did not focus upon whether the employee whose calls were monitored was informed of the monitoring. But many of the calls to which the defendants listened were "sexually provocative" exchanges between the employee and her extramarital lover.[66] Hence, the court held that the employers' interests in determining whether the employee was complicit in the robbery or making too many personal calls did not justify them in recording and listening to all 22 hours of conversation, much of which plainly was none of their business. In short, it held that the employers' "suspicions [did not] justif[y] the extent of the intrusion." [67]

■ Here, the defendants' actions in recording—as distinguished from listening to— the telephone traffic into and out of their premises was amply justified by their legitimate interests in timely provision of emergency services, ensuring employee fidelity, and protecting themselves against unfounded claims. Given the fact that alarm signals may be received at any time of the day or night, those interests could be served adequately only by the constant recording that was done. Accordingly, this Court holds that the interceptions—assuming the interceptions consisted of the recording—were made in the ordinary course of the defendants' business.

It remains to draw these two lines of analysis together. The September 8, 1995 conversation between Albero and Arias and the few conversations found on four of the reels for the twenty-nine preceding days were intercepted in the ordinary course of business irrespective of whether the interception was the recording or the listening. If interception requires that the contents of the conversations be aurally acquired in the sense of being heard by a human ear, the question whether the other conversations to which defendants listened were intercepted in the ordinary course of business presents a genuine issue of fact. If interception occurs when a conversation is recorded but not heard by a human ear, then all of the conversations were intercepted in the ordinary course of business.

Accordingly, the Court hereby determines, pursuant to Fed.R.Civ.P. 56(d), that (a) the September 8, 1995 conversation between the plaintiffs and the conversations between them that were recorded on four of the tapes for the preceding 29 days and listened to by certain of the defendants were intercepted in the ordinary course of business, and (b) the question whether any other interceptions made in this case occurred in the ordinary course of business is resolved as stated above.

*B.   The Release*

■ Defendants move also for summary judgment dismissing Arias' case on the ground that she released the claims here in suit by execution of the general release on September 12, 1995. Arias resists summary judgment on the grounds that the agreement was merely to settle her claim of sexual harassment and that she did not then know of, and in any case did not intend to release, any claim for interception of her conversations.[68] As the language of the general release Arias signed is all encompassing, the fundamental question is whether Arias may resort to evidence outside the general release in support of her contention that the scope of

**65.**   980 F.2d 1153 (8th Cir.1992).

**66.**   *Id.* at 1155.

**67.**   *Id.* at 1158.

**68.**   Arias Aff. ¶¶ 24–25.

the release was intended by the parties to be narrower.

■ Releases are a species of contract, and their construction is governed by general principles of contract law.[69] The parol evidence rule therefore applies here, as in any other contract case. If an agreement is integrated and unambiguous, it bars consideration of parol evidence to vary, contradict, add to or explain its terms.[70] In any case, consideration of the circumstances in which an agreement is executed is appropriate in understanding it even where the parol evidence rule applies.[71]

In this case, the printed form of general release recited that it was given in exchange for $3,000. It contains no integration clause. It was signed at the same time as a brief settlement agreement that referred to the same $3,000 and to the resolution of the dispute between Mutual and Arias. Moreover, the settlement agreement recited that Mutual would pay the $3,000 and that "Arias withdraws and retracts any allegations heretofore made of improper actions on the part of any and all employees of Mutual Central Alarm Services, Inc." The settlement agreement thus leaves open the possibility—assuming that it does not conclusively demonstrate—that the ostensibly general release was intended to give effect to Arias' agreed abandonment of claims previously asserted.

In these circumstances, the Court is not persuaded that the printed form was intended by the parties as a complete integration of their agreement. The parol evidence rule therefore does not apply, at least on this motion. In any case, even if Arias' *post litem motam* statements were disregarded, the settlement agreement and the printed form of release together demonstrate the existence of a genuine issue of material fact as to whether the parties intended that Arias would release all claims or only claims arising from those matters as to which she previously had complained. Accordingly, defen-

dants are not entitled to summary judgment dismissing Arias' case on the ground of release.

## II. The Motion to Amend

■ Plaintiffs seek leave to amend their complaints to assert claims under 18 U.S.C. § 2511(1)(b), which prohibits the intentional use of any covered device to intercept any oral communication, in addition to the claims previously asserted under Sections 2511(1)(a), (c) and (d). Defendants oppose the motions on the ground that they are untimely.

There is little doubt that plaintiffs' applications are products of a much belated afterthought. The scheduling order required the filing of any amendments to the pleadings or applications for leave to amend by July 31, 1997. The motions to amend were not filed until June 15, 1998, which postdated the defendants' motion for summary judgment and the joint pretrial order. Nevertheless, the issues raised by the proposed amendments would require no additional discovery. Moreover, they really raise nothing new. Defendants therefore would not be prejudiced.

Accordingly, the motions for leave to amend are granted.

### Conclusion

For the foregoing reasons, the motion for summary judgment dismissing the complaints is denied in all respects. In accordance with Rule 56(d), the Court has determined that some or all of the allegedly intercepted calls were intercepted, if at all, in the ordinary course of business as set forth in greater detail above. Plaintiffs' motions for leave to amend the complaints are granted and the proposed amended

---

**69.** *E.g., Bartel Dental Books Co. v. Schultz,* 786 F.2d 486, (2d Cir.1986), *cert. denied,* 478 U.S. 1006, 106 S.Ct. 3298, 92 L.Ed.2d 713 (1986).

**70.** *Hanley v. Lark Deli Corp.,* 2 F.Supp.2d 534, 537 (S.D.N.Y.1998); *Marine Midland Bank–*

*Southern v. Thurlow,* 53 N.Y.2d 381, 387, 442 N.Y.S.2d 417, 419, 425 N.E.2d 805 (1981).

**71.** *Hanley,* 2 F.Supp.2d at 537; *see Fireman's Fund Ins. Cos. v. Siemens Energy & Automation, Inc.,* 948 F.Supp. 1227, 1233–34 (S.D.N.Y.1996).

complaints attached to their papers are deemed served and filed as of this date.

SO ORDERED.