**Lourdes Rachel ARIAS and Louis J. Albero, Plaintiffs–Appellants,**

v.

**MUTUAL CENTRAL ALARM SERVICE, INC.; Norman Rubin; Joel Cohen and Raymond Adams, Defendants–Appellees.**

No. 99–7240.

United States Court of Appeals, Second Circuit.

Argued: Nov. 24, 1999.

Decided: Jan. 21, 2000.

Robert A. Horn, New York, N.Y., for Plaintiffs–Appellants.

Robert M. Trien, New York, N.Y., for Defendants–Appellees.

(Benjamin H. Dickens, Jr., Michael B. Adams, Jr., Blooston, Mordkofsky, Jackson & Dickens, Washington, D.C.; and S.

Bryan Lawrence, Buchanan Ingersoll, P.C., Pittsburgh, P.A., for Amici Curiae the Alarm Industry Communications Committee and the National Burglar and Fire Alarm Association, Inc.)

(Jeremy E. Gruber, American Civil Liberties Union Foundation, Princeton, N.J.; and Alan Hyde, Rutgers University School of Law; Newark, N.J., for Amicus Curiae The American Civil Liberties Union Foundation.)

Before: LEVAL, CALABRESI and KATZMANN, Circuit Judges.

KATZMANN, Circuit Judge:

Lourdes Rachel Arias and Louis J. Albero seek civil damages under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. § 2510 *et seq.* ("Title III"), claiming that their former employer, Mutual Central Alarm Service, Inc. ("Mutual"), and certain of its officers unlawfully intercepted private and privileged telephone conversations by recording such conversations with a Dictaphone 9102 machine attached to Mutual's telephone system. The district court denied defendants' initial motion for summary judgment by opinion dated September 11, 1998, *see Arias v. Mutual Central Alarm Serv., Inc.,* 182 F.R.D. 407 (S.D.N.Y.1998), but granted defendants' renewed motion for summary judgment in January 1999, on the ground that defendants did not "intercept" any conversations within the meaning of Title III using an "electronic, mechanical or other device," 18 U.S.C. § 2510(4), because any recording of such conversations occurred in the ordinary course of business. Plaintiffs contend on appeal that defendants' blanket recording of all incoming and outgoing telephone calls from Mutual's offices is not in the ordinary course of business and therefore in violation of Title III. We disagree and therefore affirm the judgment below.

**BACKGROUND**

The factual background in this appeal is more fully set forth in the district court's initial opinion of September 1998. *See Arias,* 182 F.R.D. at 409–13. Mutual is a provider of central station alarm services, that is, it monitors the burglar and fire alarms of its customers and notifies the police, the fire department and/or other emergency services when it receives a signal that an alarm has been activated. *See id.* at 409. In 1990, when Mutual began conducting business at its offices in New York City, it purchased a Dictaphone 9102 machine to comply with the industry-wide practice of monitoring and recording all telephone calls to and from the central station. *See id.* at 410. Not only is the recording of all telephone conversations to which central station employees are parties routine among central station alarm companies, but such recording is recommended or even mandated by various standard-setting and regulatory bodies in the industry. *See id.* Underwriters Laboratories, Inc., which sets the standards under which central station alarm companies must operate to obtain "UL" certification, recommends the use of telephone recording equipment. *See id.* Hanover Insurance, a leading underwriter of burglary risks, regards as "essential" the recording of all telephone communications between the central station, the customer and the police, fire department and other authorities. *See id.* Further, the Central Station Alarm Association states in its standards document that "[a]ll telecommunications shall be recorded or monitored," and the New York City Fire Department requires the installation of automatic recording equipment on all lines used to communicate with the Fire Department. *See id.*

When the Dictaphone machine was initially installed in Mutual's offices at the end of 1990 or the beginning of 1991, it was directly connected to each of the telephones used by Mutual's employees at that time. *See id.* In early 1994, following a renovation of Mutual's premises and in

light of increases in the number of Mutual's employees, the Dictaphone machine was connected to Mutual's telephone system via the telephone lines used by Mutual, rather than attached to each of Mutual's telephones. *See id.* The telephone lines entering Mutual's premises are connected to a demarcation or "demarc" junction box, which is owned by the telephone company. The demarc junction box, which indicates the boundary between equipment owned and maintained by the telephone company and that owned and maintained by Mutual, is further connected to a second junction box, which is in turn connected to the Dictaphone machine. The Dictaphone machine records all incoming and outgoing telephone calls on 30 sequentially numbered tapes, each of which records for approximately 24 hours. *See id.* At the end of the thirtieth tape, recording continues over the first numbered tape. *See id.* at 410–11.

Plaintiffs Albero and Arias were both employees of Mutual. Albero was hired in August 1990 as a bookkeeper and office manager shortly after Mutual was formed, and Arias was hired in September 1993 as an administrative assistant. *See id.* at 409, 411. While the record below is somewhat ambiguous regarding when the 24–hour recording of all telephone lines at Mutual began, *see id.* at 410, plaintiffs allege that their private and personal telephone conversations were recorded by defendants from at least February 1994 onwards. Around December 1993 or January 1994, plaintiffs allege that they and other employees of Mutual began hearing "beeps" during their telephone conversations, and complained about this matter to their employers. Arias and Albero allege that defendant Norman Rubin, formerly the Chairman of the Board of Directors, Secretary and Treasurer of Mutual,[1] assured Mutual's employees that their telephone conversations were not being recorded, and that Mutual's employees subsequently stopped hearing the "beeps" during their telephone calls.

There are a series of somewhat convoluted personal relationships between the parties, *see id.* at 409–13, which are not directly relevant to the issues raised in this appeal. In the course of a dispute between Arias and defendants following her resignation in August 1995, Rubin began to suspect that Albero, who was involved in divorce proceedings with Rubin's granddaughter and was having an affair with Arias, was a faithless employee. *See id.* at 411–12. It was during this time that Albero and Arias allegedly first became aware that Mutual had been continually recording the telephone conversations of all its employees, including theirs.[2] In addition, Albero allegedly overheard Joel Cohen, Raymond Adams and Joe DiGilio, who were officers and employees of Mutual, listening to recordings of his telephone conversations, and obtained confirmation that Mutual's telephone lines were being recorded and that some or all of defendants had listened to a number of plaintiffs' telephone conversations. There is no dispute that all of Mutual's telephone lines were being continually monitored and recorded, and that defendants listened to a number of plaintiffs' telephone conversations. Albero's employment at Mutual ended in October 1995.

Albero and Arias initiated separate actions against defendants in November 1996, alleging that defendants intentionally intercepted, used and disclosed their private and personal telephone conversations. The district court consolidated these two actions for pretrial purposes, given the considerable factual and legal overlap be-

---

1. The death of defendant Norman Rubin during the course of the litigation in the district court was noted in the record below by Suggestion of Death dated December 8, 1998.

2. While there are disputed issues of fact regarding whether and when plaintiffs knew that their telephone conversations were being recorded, these issues do not affect the resolution of this appeal. *See infra* note 4 and accompanying text.

tween them. Following the end of discovery, defendants filed a motion for summary judgment in April 1998. The district court issued a comprehensive and thoughtful opinion in September 1998. *See id.* at 407. The district court first noted that there were genuine issues of material fact as to whether plaintiffs had consented to the alleged interceptions, but focused on the other arguments advanced by defendants as to which the facts were largely undisputed in denying defendants' motion. *See id.* at 409. In so holding, the district court noted that the parties had assumed that plaintiffs' telephone conversations were "intercepted" within the meaning of Title III, without addressing the issue of whether such interception consisted of recording or listening. *See id.* at 415. While expressly declining to rule on this issue without the benefit of briefing, the district court reasoned that there were genuine issues of material fact remaining as to whether defendants listened to a number of plaintiffs' telephone conversations in violation of Title III. *See id.* Applying an exception to Title III for certain kinds of interceptions in the ordinary course of business, the district court found that defendants may have listened to a number of conversations outside the scope of such exception. *See id.* However, the district court also found that the blanket recording of plaintiffs' telephone conversations raised no issues of material fact, as such recording was conducted in the ordinary course of business. *See id.* at 415–17.

Defendants renewed their motion for summary judgment in November 1998. Finding the renewed motion ripe for decision, the district court granted summary judgment for defendants by opinion dated January 21, 1999. The district court noted that there was some confusion over which device, the demarc junction box and/or the Dictaphone machine, intercepted plaintiffs' telephone calls. However, this issue did not affect the resolution of the summary judgment motion below, as plaintiffs conceded that the Dictaphone machine was the sole intercepting device, and that it constituted a "telephone or telegraph instrument, equipment or facility, or component thereof" under Title III, a statutory prerequisite to trigger the ordinary course of business exception. Further, plaintiffs stated that the alleged interception on which their claims were based was the recording of their telephone conversations. Given these premises, the district court adhered to its prior ruling that the recording of plaintiffs' telephone conversations did not violate Title III, because such recording fell within the ordinary course of business exception. The district court stated that plaintiffs had attempted, in effect, to reargue the claims of illegal recording dismissed in its September 1998 opinion. Although the court noted that plaintiffs had committed a number of procedural irregularities in doing so, it nevertheless reviewed plaintiffs' arguments and an additional affidavit by Albero and determined that dismissal of the complaints was proper in any event. Plaintiffs timely filed a consolidated notice of appeal from this dismissal.

## DISCUSSION

We review the district court's decision to grant summary judgment *de novo*. *See Fund for Animals v. Babbitt*, 89 F.3d 128, 132 (2d Cir.1996). Viewing the evidence in the light most favorable to plaintiffs, the non-moving party, this Court's task is to determine whether there are any genuine issues of material fact sufficient to preclude summary judgment. *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–57, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Title III provides, *inter alia*, both civil and criminal penalties for any person who intentionally (i) "intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept" any oral communication; (ii) uses an "electronic, mechanical, or other device" to do so; (iii) discloses or endeavors to disclose the contents of such intercepted communica-

tion to any other person; or (iv) uses or endeavors to use the contents of such intercepted communications. 18 U.S.C. § 2511(1)(a)-(d) (1994 & Supp.1999); *see id.* §§ 2520(a), 2511(4). "Intercept" is defined under Title III as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." *Id.* § 2510(4). Further, "electronic, mechanical, or other device" is defined as:

> any device or apparatus which can be used to intercept a wire, oral, or electronic communication other than—
>
> (a) *any telephone or telegraph instrument, equipment or facility, or any component thereof,* (i) furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business or *furnished by such subscriber or user for connection to the facilities of such service and used in the ordinary course of its business ....*

*Id.* § 2510(5) (emphasis added).

Given this statutory framework, any interception is not actionable under Title III if the "aural or other acquisition" of the contents of plaintiffs' telephone conversations occurred (i) through the use of a telephone instrument; (ii) either furnished by the telephone service provider in the ordinary course of business or furnished by Mutual for connection to its telephone facilities; and (iii) used by Mutual in the ordinary course of its business. As the district court explicitly noted in its opinion below, plaintiffs have made a number of critical concessions enabling us to streamline the above analysis. First, plaintiffs argued that any illegal interception occurred via the Dictaphone machine, and that the Dictaphone machine is a "telephone ... instrument, equipment or facility, or ... component thereof." [3] Further, while defendants acknowledge that the Dictaphone machine was not provided by the telephone company, plaintiffs also conceded that the Dictaphone machine was furnished by Mutual for connection to the facilities of its telephone service. Plaintiffs do not dispute that they have made these concessions below, and have renewed them before this Court.

Therefore, the resolution of this appeal turns on two narrow issues: whether any "aural or other acquisition" occurred within the meaning of Title III, and whether any alleged interception was in the ordinary course of Mutual's business.

The case law with respect to Title III is somewhat unclear regarding the proper definition of an "interception" under the statute. *See Arias,* 182 F.R.D. at 414–15 & n. 47 (discussing cases). While the district court declined to resolve this issue definitively, it cited with approval the Ninth Circuit's holding in *Greenfield v. Kootenai County,* 752 F.2d 1387 (9th Cir.

---

**3.** Neither proposition is free from doubt. *See Arias,* 182 F.R.D. at 413–14. First, there is a potential factual issue regarding whether the demarc junction box, the device through which the communications transmitted via Mutual's telephone lines are first "captured or redirected," may constitute the telephone instrument in question, either in lieu of or in addition to the Dictaphone machine or perhaps the second junction box. *United States v. Rodriguez,* 968 F.2d 130, 136 (2d Cir.1992); *compare Epps v. Saint Mary's Hosp. of Athens, Inc.,* 802 F.2d 412, 415 (11th Cir.1986) (holding that dispatch console, rather than recording device attached to console, was the interception device), *with Deal v. Spears,* 980 F.2d 1153, 1157–58 (8th Cir.1992) (holding that recording device and not extension phone to which it was connected, was instrument used to intercept telephone calls). Second, it is unclear whether certain recording devices, including the Dictaphone machine, may constitute an appropriate telephone instrument under Title III. *See, e.g., Sanders v. Robert Bosch Corp.,* 38 F.3d 736, 740 nn. 8, 9 (4th Cir.1994) (holding that recording device that neither was of a type sold by telephone service provider nor furthered defendant's communication system was not a telephone instrument under Title III); *Deal,* 980 F.2d at 1158 (holding that analogous recording device was also not a piece of telephone equipment).

1985). *See Arias*, 182 F.R.D. at 414. The *Greenfield* court held that telephone calls that were automatically recorded but not listened to were not aurally acquired within the meaning of Title III. *See Greenfield*, 752 F.2d at 1389. As the district court correctly noted, although the definition of "intercept" was subsequently amended to encompass "aural *or other* acquisition," 18 U.S.C. § 2510(4) (emphasis added), this amendment sheds no light on the definition of "intercept" with respect to the oral communications at issue here. *See United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir.1992) ("The phrase 'or other' was inserted into the present definition as part of a modernization of Title III to ensure privacy protection for new forms of communication such as electronic pagers, electronic mail, and computer-to-computer communications." (citing S.Rep. No. 99–541 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3555–57, 3562–65, 3567)).

We do not doubt that listening would constitute "aural acquisition" within the meaning of Title III. *See Rodriguez*, 968 F.2d at 136 ("Though it is plain that Congress intended to expand the scope of Title III to extend its protections to modern forms of communication, there is no indication ... that it intended to extinguish the principle that the place where the contents of a wire communication are first to be heard and understood by human ears, other than those of the parties to the conversation, is the situs of an interception within the meaning of [Title III].") The logic of *Rodriguez* suggests that recording alone can also constitute an "aural or other acquisition," *see id.*, and the Fourth Circuit has explicitly so held. *See Sanders v. Robert Bosch Corp.*, 38 F.3d 736, 740 (4th Cir.1994). *But cf. Greenfield*, 752 F.2d at 1389 (holding that recording alone did not constitute "aural acquisition"). However, plaintiffs have stated, both implicitly in their brief on appeal and explicitly at oral argument before this Court, that their complaints are premised solely on the alleged illegal recording of their telephone conversations, and not on defendants' lis-

tening to their conversations. Therefore, we assume, without deciding, that the recording at issue constitutes an "aural acquisition" for the purposes of this appeal. To the extent that there is some conflict over the proper interpretation of the term "interception," we note that clarification of the language and definitions of Title III may merit congressional attention.

■ Thus, the sole remaining issue on appeal is whether the blanket recording of plaintiffs' conversations was in the ordinary course of business. Plaintiffs and *amicus* American Civil Liberties Union Foundation argue that the surreptitious, 24–hour recording of all telephone conversations, regardless of the personal, private and privileged nature of some of the conversations, is not in the ordinary course of business. The argument, in effect, hinges on the allegedly surreptitious nature of the recording. Plaintiffs contend that even if 24–hour recording is supported by a purportedly legitimate business purpose, defendants must nevertheless provide plaintiffs with notice if such blanket recording is to fall within the ordinary course of business exception. We disagree.

■ As the district court recognized, there are genuine issues of material fact regarding whether plaintiffs had consented to the recording of their telephone conversations. *See Arias*, 182 F.R.D. at 409. Plaintiffs and defendants vigorously disagree whether Mutual's employees generally, and Albero in particular, could be said to have consented to the Dictaphone machine's recording of their telephone conversations. However, Title III has a separate exception permitting a person to intercept communications where "such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception," unless the interception is for criminal or tortious purposes. 18 U.S.C. § 2511(2)(d); *see, e.g., United States v. Workman*, 80 F.3d 688, 692–93 (2d Cir. 1996) (recognizing consent exception in

§ 2511(2)(c) and stating that the consent may be express or implied). Given the existence of this distinct consent exception, we hold that it is a misreading of Title III to import wholesale a consent requirement into the ordinary course of business analysis at issue here.[4] *Cf. Anonymous v. Anonymous,* 558 F.2d 677, 679–80 nn. 5, 7 (2d Cir.1977) (recognizing consent exception and declining to consider issue of consent in conducting ordinary course of business analysis). Rather, as the District of Columbia Circuit has stated, "if covert monitoring is to take place it must itself 'be justified by a valid business purpose,' or, perhaps, at least must be shown to be undertaken normally." *Berry v. Funk,* 146 F.3d 1003, 1009 (D.C.Cir. 1998) (citation omitted) (quoting *Sanders,* 38 F.3d at 741). In the matter before us, we do not need to articulate a precise rule in order to resolve this issue, because both of these elements, which comport with the common understanding of "ordinary course of business," are amply satisfied.

Legitimate business reasons support the continual recording of all incoming and outgoing telephone calls at Mutual. Central station alarm companies are the repositories of extremely sensitive security information, including information that could facilitate access to their customers' premises. Further, because such companies are contracted to contact promptly the various authorities and emergency services, accurate recording of such calls may assist the company, its customers and the police and

fire departments. "Complete records of calls made to and from central stations therefore are important tools for their operators to ensure that their personnel are not divulging sensitive customer information, that events are reported quickly to emergency services, ... that customer claims regarding events are verifiable," and that the police and other authorities may rely on these records in conducting any investigations. *Arias,* 182 F.R.D. at 410. Not only is the 24-hour scope of the recording justified, but the alleged lack of notice is justified as well in this context. Whether notice is required depends on the nature of the asserted business justification, and here, where the recording is at least in part intended to deter criminal activity, the absence of notice may more effectively further this interest.[5]

Finally, as stated above, there is no dispute that the recording in question is standard practice within the central station alarm industry, is recommended by Mutual's underwriters and the relevant trade association, and may be required by the authorities in certain instances. There is no evidence in the record to indicate whether recording employees' telephone calls with notice of such recording is common in the industry, and plaintiffs have advanced no facts or arguments that suggest that notice is customary or required.

Therefore, we affirm the district court's holding with respect to the ordinary course of business issue, such that the grant of summary judgment was proper.

**4.** Thus, if consent to the recording had in fact been given, then the consent exception would apply and there would be no need to conduct the ordinary course of business analysis at all, and *a fortiori* no need to consider whether the kind of allegedly covert recording at issue here could ever be in the ordinary course of business. However, we note that although the consent exception is statutorily distinct, in certain situations both the consent and the ordinary course of business exceptions may apply, if, for example, notice of monitoring is customary in the industry.

**5.** Plaintiffs contend that, while these justifications might legitimate the recording of all of

the telephone calls of central station employees, they were not "central station employees" within the meaning usually given to those words in the industry. We disagree. The record below clearly indicates that Mutual's entire office was certified as a "central station" during its last industry inspection. Further, nothing in the record indicates that the industry-wide practice of recording employee calls is limited to those whose primary duty is to field alarm signals and report them to the appropriate authorities. Indeed, many of the justifications offered to support wholesale recording apply with equal force to administrative employees.

## CONCLUSION

We have considered all of plaintiffs' other arguments and found them to be without merit. For all of the foregoing reasons, the judgment of the district court is affirmed.